**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WISCONSIN**

| | |
|---|---|
| Philly Phlava Original Steaks and Hoagies, Inc., individually and on behalf of all others similarly situated, | Case No. 3:26-cv-00417 CLASS |
| Plaintiff, | ACTION COMPLAINT |
| v. | DEMAND FOR JURY TRIAL |
| Cal-Maine Foods, Inc., Rose Acre Farms, Inc., Versova Holdings, LLC, Hillandale Farms of Pa., Inc., Hillandale-Gettysburg, LLC., Hillandale Farms East, Inc., and Hillandale Farms, Inc, Daybreak Foods, Inc., Urner Barry Publications, Inc. d/b/a Expana, Egg Clearinghouse, Inc., United Egg Producers, and John Does 1-10, | |
| Defendants. | |

**TABLE OF CONTENTS**

I.    NATURE OF THE CASE ............................................................................................ 1

II.   THE PARTIES ............................................................................................................ 3

    A.  Plaintiff ............................................................................................................3

    B.  Defendants .......................................................................................................3

        1.   Cal-Maine ............................................................................................ 3

        2.   Rose Acre ............................................................................................. 5

        3.   Daybreak Foods ................................................................................... 5

        4.   Hillandale Farms .................................................................................. 6

        5.   Opal Foods ........................................................................................... 7

        6.   Versova Holdings LLP ......................................................................... 7

        7.   Urner Barry Publications, Inc. d/b/a Expana ...................................... 8

        8.   Egg Clearinghouse, Inc. ...................................................................... 8

        9.   United Egg Producers .......................................................................... 9

        10.  Co-Conspirators and Agents .............................................................. 10

III.  JURISDICTION AND VENUE ............................................................................... 10

IV.  FACTUAL ALLEGATIONS .................................................................................... 11

    A.  Background .....................................................................................................11

        1.   Eggs Are a Vital Consumer Good that is Inelastic ............................11

        2.   The U.S. Egg Industry is Massive ..................................................... 12

        3.   The Conventional Eggs Market and Egg Production ........................ 13

        4.   Conventional Eggs Are a Commodity Product................................... 16

        5.   Defendants Use Consolidation and Vertical Integration to Dominate the Egg Industry ............................................................................................... 16

        6.   The Urner Barry Pricing Benchmarks (Incorporating ECI Data) Are the Basis for Industrywide Conventional Egg Contract Prices ......................................... 20

    B.  Defendants' Anticompetitive Conduct..........................................................23

        1.   Defendants Conspired to Raise Egg Prices Using the Urner Barry Index (and ECI data Incorporated Therein) ................................................................ 24

        2.   Defendants Reaped Substantial Profits as a Result of Their Conspiracy to Increase Prices .................................................................................................. 27

3. The Egg Price Increases Cannot Be Explained by Market Conditions ............. 27

i. The Price of Inputs Cannot Explain the Increase in Egg Prices ....................... 27

ii. Avian Flu Outbreaks Do Not Explain the Increase in Egg Prices ..................... 28

4. United States Department of Justice Has Investigated the Same Coordinated Price Conduct.................................................................................................... 31

5. Defendants' Prior Anticompetitive Conduct and Unfair Business Practices ..... 32

6. "Plus Factors" in the Conventional Egg Industry Provide Additional Evidence of Defendants' Conspiracy to Increase Conventional Egg Prices ..................... 33

i. Defendants Shared Competitively Sensitive Information through the Urner Barry Index ................................................................................................. 34

ii. Defendants Engaged in Price Verification ......................................................... 34

iii. Urner Barry Provides a Motive to Conspire ...................................................... 35

iv. Defendants Had Ample Opportunities to Conspire ........................................... 35

v. The Egg Production Industry Is Highly Concentrated....................................... 36

vi. Egg Producers Face Significant Barriers to Entry ............................................ 37

vii. Conventional Eggs Are Inelastic Commodity Products..................................... 37

V. ANTICOMPETIVE EFFECTS & DAMAGES.................................................... 38

VI. RELEVANT MARKET ..................................................................................... 40

    A. The Relevant Product Market Is Conventional Eggs....................................40

    B. The Relevant Geographic Market is National ...........................................41

VII. CLASS ACTION ALLEGATIONS .................................................................. 41

VIII. FRAUDULENT CONCEALMENT AND TOLLING ....................................... 44

IX. CAUSES OF ACTION ...................................................................................... 45

X. PRAYER FOR RELIEF...................................................................................... 70

XI. DEMAND FOR TRIAL BY JURY ................................................................... 71

Plaintiff Philly Phlava Original Steaks and Hoagies, Inc. ("Plaintiff"), individually and on behalf of the Commercial Indirect Purchaser Classes defined below, brings this class action against Cal-Maine Foods, Inc. ("Cal-Maine"); Rose Acre Farms, Inc. ("Rose Acre"), Versova Holdings, LLC ("Versova"); Hillandale Farms, which is comprised of Hillandale Farms of Pa., Inc., Hillandale-Gettysburg, LLC., Hillandale Farms East, Inc., and Hillandale Farms, Inc (together "Hillandale Farms"); Daybreak Foods, Inc. ("Daybreak Foods"); Urner Barry Publications, Inc. d/b/a Expana ("Urner Barry" or "Expana"), Egg Clearinghouse, Inc. ("ECI"); United Egg Producers ("UEP"); and John Does 1-10 (together the "Defendants") to recover treble damages, injunctive relief, and any other relief as appropriate, based on violations of the Sherman Act and various state antitrust and consumer protection laws.

## I.      NATURE OF THE CASE

1.      Defendants have conspired to fix, raise, maintain, or stabilize prices for conventional fresh shell eggs ("Conventional Eggs") from at least January 1, 2022 until Defendants' unlawful conduct and its anticompetitive effects ceases ("Class Period").

2.      Conventional Eggs comprise most of the shell eggs sold in the United States. In 2024, almost three-quarters of the U.S. shell egg market constituted Conventional Eggs. Other shell eggs include cage-free eggs (about 23.2 percent of the shell egg market), and pasture-raised (less than five percent of the shell egg market).

3.      Defendants Cal-Maine, Rose Acre, Versova, Hillandale, and Daybreak ("Egg Producer Defendants") are the five biggest egg producers in the United States and own almost half of all egg-laying commercial hens.

4.      Defendant and publisher Urner Barry collects, analyzes, and disseminates current information to its food industry customers in the egg, poultry, meat, seafood, plant protein, and

related segments. Urner Barry provides actionable, competitive information related to the egg market to the Egg Producer Defendants and other egg producers.

5.     Egg Producer Defendants reported inflated assessments of egg prices to Urner Barry. Urner Barry then published price quotes using the information provided by its subscribers, including the Egg Producer Defendants. It also used transaction prices from Defendant ECI's private online spot market for egg trading.

6.     The limited transactions on the ECI, along with Egg Producer Defendants' significant size, allowed the Egg Producer Defendants to easily impact ECI volume and pricing, which in turn influenced the Urner Barry quote.

7.     Urner Barry's price quotes set a benchmark for Defendants' Conventional Egg sales, with Urner Barry and ECI intensifying price fluctuations initiated by the major producers and limiting independent pricing decisions by others. Defendants' manipulation of Urner Barry benchmarking allowed them to impose price increases on their customers.

8.     Defendants attributed rising prices during the Class Period to Highly Pathogenic Avian Influenza H5N1 ("HPAI"), which caused the culling of millions of layer hens from late 2021. However, HPAI does not solely account for the egg prices increase observed during the Class Period. Instead, Defendants' blame on HPAI is pretextual. Neither HPAI nor input costs account for Conventional Egg price increases over the Class Period. Relevant egg production inputs actually *fell* while egg prices continued to increase.

9.     Egg prices dropped after March 2025, only when Defendants' alleged misconduct became public through the revelation of the Department of Justice's ("DOJ") investigation of the industry for price fixing, with Cal-Maine, Rose Acre, and Urner Barry reportedly among those under scrutiny.

2

10.    The shell egg industry is structurally susceptible to collusion, featuring a commodity product, highly concentrated and vertically integrated producers, high entry barriers, inelastic demand, and numerous opportunities to collude.

11.    Plaintiff, on behalf of himself and all other consumer indirect purchasers of Conventional Eggs during the Class Period, brings this class action complaint against Defendants for violations of Section 1 of the Sherman Antitrust Act, as well as various state antitrust, consumer protection, and unjust enrichment laws.

## II.    THE PARTIES

### A.    Plaintiff

12.    Plaintiff Philly Phlava Original Steaks and Hoagies, Inc. is a private corporation incorporated in Florida with its principal place of business located at 2045 Gunn Highway Odessa, Florida, 33556.

13.    During the Class Period, Plaintiff purchased Conventional Eggs indirectly from one or more Defendants for its own business use in commercial food preparation. Plaintiff suffered antitrust injury and damages by paying artificially inflated prices as a direct result of the antitrust violations alleged herein.

### B.    Defendants

#### 1.    Cal-Maine

14.    Defendant **Cal-Maine Foods, Inc.** ("Cal-Maine") is a public corporation incorporated in Delaware with its principal place of business located at 1052 Highland Colony Parkway, Suite 200, Ridgeland, Mississippi, 39157.

15.    Cal-Maine was founded in 1957 as Adams Food. In 1969 it merged with Dairy Fresh Products and Maine Eggs farms in 1969 to form Cal-Maine Foods. Cal-Maine has continued to aggressively acquire egg producers in the country, acquiring and integrating at least 24

3

companies since 1989. In 2024, Cal-Maine acquired three additional companies and added 5.9 million egg-laying hens to its flock. This includes its July 2024 acquisition of ISE America, a top 25 shell egg producer with a flock of approximately 4.7 million hens. Cal-Maine credits its success to, *inter alia*, its "disciplined acquisition strategy."[1]

16.    Cal-Maine is the largest Conventional Egg producer and marketer in the United States. Cal-Maine processes and packages approximately 674,700 dozen shell eggs per hour. In 2023, Cal-Maine achieved record sales of $3.15 billion with over 1.5 billion dozens sold.

17.    Cal-Maine has 49 egg productions facilities throughout the country, including in Alabama, Arkansas, Florida, Georgia, Kansas, Kentucky, Louisiana, Maryland, Mississippi, Ohio, Oklahoma, South Carolina, Texas, and Utah.

18.    Cal-Maine is also known for being a vertically integrated operation. Cal-Maine explained to its investors in a 2025 presentation that its "[f]ully integrated operations allow for scaled production and distribution capacity."[2] As a vertically integrated operation, its operations include hatching chicks, growing and maintaining chicken flocks, manufacturing feed, and producing, processing, packaging, and distributing shell eggs.

19.    Upon information and belief, Cal-Maine subscribed to Urner Barry and its Conventional Egg prices are tied to Urner Barry's egg price index.

20.    Cal-Maine sold Conventional Eggs to purchasers in the United States, including members of the Class, during the Class Period.

---

[1] Cal-Maine Foods, "Our History," https://www.calmainefoods.com/history (last visited Apr. 27, 2026)

[2] Cal-Maine Foods, "2Q 2025 Investor Presentation" (Jan. 2025), https://irp.cdn-website.com/79e86203/files/uploaded/CALM_FY25_2Q_Investor_Presentation_Accessible.pdf.

**2.      Rose Acre**

21.      Defendant **Rose Acre Farms, Inc.** ("Rose Acre") is private corporation incorporated in Indiana with its principal place of business located at 1657 W. Tipton Street, Seymour, Indiana, 47274.

22.      Founded in the 1930s, Rose Acre is the second largest egg producer in the United States. Rose Acre has sixteen egg production facilities throughout the country located in Indiana, Illinois, Missouri, North Carolina, Georgia, Iowa, and Arizona. As of 2024, it had nearly 26 million egg-laying hens.

23.      Upon information and belief, Rose Acre subscribed to Urner Barry and its Conventional Egg prices are tied to Urner Barry's egg index.

24.      Rose Acre sold Conventional Eggs to purchases in the United States, including members of the Class, during the Class Period.

**3.      Daybreak Foods**

25.      Defendant **Daybreak Foods, Inc.** ("Daybreak") is a private corporation incorporated in Wisconsin with its principal place of business located at 533 E. Tyranena Park Road, Lake Mills, Wisconsin, 53551.

26.      Founded in 1967, Daybreak is one of the largest Conventional Egg producers in the United States. Daybreak has egg production facilities throughout the country, including Wisconsin, Minnesota, Michigan, Iowa, Illinois, and Ohio. Daybreak produces approximately 16 million eggs per day. Daybreak has more than 24 million egg laying hens.

27.      Upon information and belief, Daybreak subscribed to Urner Barry and its Conventional Egg prices are tied to Urner Barry's egg index.

28.      Daybreak sold Conventional Eggs to purchasers in the United States, including members of the Class, during the Class Period.

### 4.    Hillandale Farms

29.    Defendant Hillandale Farms is comprised of several related companies, including Defendants Hillandale Farms of Pa., Inc., Hillandale-Gettysburg, LLC, Hillandale Farms East, Inc.—all incorporated in Pennsylvania—and Hillandale Farms, Inc., incorporated in Ohio (collectively referred to as "Hillandale Farms"). Hillandale Farms is headquartered in Gettysburg, Pennsylvania.

30.    Hillandale is one of the largest egg producers in the United States. Hillandale has several egg production facilities throughout the country, including Pennsylvania and Ohio. Hillandale produces approximately 38 million eggs per month.  As of 2024, it had nearly 19 million egg-laying hens.

31.    Hillandale is also a vertically integrated operation. It describes itself as being "directly involved in every aspect of egg production and distribution."[3]

32.    Hillandale was recently acquired for over $1 billion by Luxembourg-based company Global Eggs. Global Eggs is the world's second largest egg producer, with 93 farms across 3 continents and over 13 billion eggs produced annually.

33.    Upon information and belief, Hillandale subscribed to Urner Barry and its Conventional Egg prices are tied to Urner Barry's egg index.

34.    Hillandale sold Conventional Eggs to purchasers in the United States, including members of the Class, during the Class Period.

---

[3] Hillandale Farms, Press Release: "Hillandale Farms Appoints Kevin Jackson Chief Executive Officer" (July 28, 2022),

https://www.globenewswire.com/news-release/2022/07/28/2487513/0/en/Hillandale-Farms-Appoints-Kevin-Jackson-ChiefExecutive-Officer.

### 5.    Opal Foods

35.    Defendant **Opal Foods, LLC** ("Opal Foods") is a private limited liability corporation incorporated in Delaware with its principal place of business located at 16194 Highway 59, Neosho, Missouri 64850.

36.    Opal Foods is a producer of Conventional Eggs. Since 2020, Opal Foods has operated as a joint venture owned by Rose Acre Farms and Weaver Brothers, Inc.

37.    Opal Foods has acquired numerous large egg producers, including Sparboe.

38.    Upon information and belief, Opal Foods subscribed to Urner Barry and its Conventional Egg prices are tied to Urner Barry's egg index.

39.    Opal Foods sold Conventional Eggs to purchasers in the United States, including members of the Class, during the Class Period.

### 6.    Versova Holdings LLP

40.    Defendant Versova Holdings LLP ("Versova") is a limited liability partnership organized in Iowa with its principal place of business located at 241 St. Andrews Way, Sioux Center, Iowa 51250.

41.    Versova is one of the largest egg producers in the United States. Versova has several egg production facilities throughout the country, including five in Iowa and additional facilities in Ohio, Washington, and Oregon. As of 2024, Versova had over 18 million egg-laying hens.

42.    Upon information and belief, Versova subscribed to Urner Barry and its Conventional Egg prices are tied to Urner Barry's egg index.

43.    Versova sold Conventional Eggs to purchasers in the United States, including members of the Class, during the Class Period.

**7.    Urner Barry Publications, Inc. d/b/a Expana**

44.    Defendant Urner Barry Publications, Inc., d/b/a Expana, ("Urner Barry") is a private corporation incorporated in New Jersey, with its principal place of business located at 1001 Corporate Cir., Toms River, New Jersey, 08755.

45.    Urner Barry's history traces back to price circulars in the 1950s.

46.    Urner Barry is the leading provider of pricing intelligence to the poultry, egg, meat, and seafood industries.

47.    Urner Barry created Comtell® On-Line ("Comtell") in 2000. Urner Barry calls Comtell "the most accessible, accurate and timely source for news, quotes and research"[4] in several food-related industries, including eggs. Comtell subscribers "are updated several times a day on the most impactful market conditions."[5]

48.    Urner Barry was previously a subsidiary of AgriBriefing Limited. In 2023, the U.K.-based Mintec Group acquired AgriBriefing in a deal that included Urner Barry. Like Urner Barry, Mintec is a provider of market intelligence and price data. In 2024, the Mintec Group consolidated all its operations under the single brand name Expana.

49.    For decades, Urner Barry has published egg prices to industry participants. All of the Egg Producer Defendants are users of Urner Barry.

**8.    Egg Clearinghouse, Inc.**

50.    Defendant Egg Clearinghouse, Inc. ("ECI") is a private corporation incorporated in Delaware with its principal place of business located at 122 Broadway, Dover, New Hampshire, 03820.

---

[4] Urner Barry, "Our History," https://www.urnerbarry.com/OurHistory (last visited Apr. 27, 2026).

[5] Urner Barry, "Market Prices," https://www.comtell.com/Marketing/Market-Prices (last visited Apr. 27, 2026).

8

51.    ECI describes itself as an "exchange to help determine and establish market value for eggs and egg products."[6] It operates the only online spot market that allows members (farmers and egg buyers) to bid on eggs listed for sale.

52.    In 2024, 2.6 billion eggs and 39 million pounds of egg products, valued at more than $600 million, were traded on the ECI online platform.

53.    ECI data feeds directly into Urner Barry.

54.    ECI represents just 5% of the shell egg market but plays an outsized role in how eggs are produced nationwide.

### 9.    United Egg Producers

55.    Defendant United Egg Producers d/b/a Egg Farmers of America ("UEP") is a private corporation incorporated in Maine with its principal place of business located at 6455 East Johns Crossing, Suite 410, Johns Creek, Georgia, 30097.

56.    UEP is a national cooperative of egg farmers representing the ownership of over 90% of eggs produced in the United States, and 95% of the country's egg-laying hens. It is a policy and lobbying organization that works to "address legislative, regulatory and advocacy issues impacting egg production."[7] UEP says its members "directly guide the future of egg farming."[8]

57.    In 1983, UEP formed the United Egg Association ("UEA"). UEA is a national trade association for egg producers and packers, further processors, and allied members. UEA also operates EGGPAC, a political action committee.

---

[6] Egg Clearinghouse, Inc., https://www.eggs.org/ (last visited Apr. 27, 2026).

[7] United Egg Producers, "About," https://unitedegg.com/about/ (last visited Apr. 15, 2026).

[8] *Id.*

### 10.    Co-Conspirators and Agents

58.    Various other persons, firms, and corporations not named as Defendants have participated as co-conspirators with Defendants and have performed acts in furtherance of the illegal conduct described in this Complaint. Defendants are jointly and severally liable for the acts of these unnamed co-conspirators. They have participated as co-conspirators with Defendants in the offenses alleged and have performed acts and made statements in furtherance of the contract, combination, or conspiracy to raise prices of Conventional Eggs.

59.    Whenever reference is made to any act of any corporation, the allegation means that the corporation engaged in the act by or through its officers, directors, agents, employees, or representatives while they were actively engaged in the management, direction, control, or transaction of the corporation's business or affairs.

60.    Defendants are also liable for acts done in furtherance of the alleged conduct by companies they acquired through mergers and acquisitions.

## III.    JURISDICTION AND VENUE

61.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1337(a), as this action arises under Sections 1 of the Sherman Antitrust Act, 15 U.S.C. §§ 1, 3, and Section 16 of the Clayton Act, 15 U.S.C. § 26.

62.    This Court has personal jurisdiction over each Defendant because they have purposefully availed themselves of the privilege of transacting business in the United States, including this District, which is home to one of the principal Egg Producer Defendants, Daybreak; have substantial contacts within the United States, including this District, including through the presence of Daybreak; and are engaged in a conspiracy that is aimed at causing, and has caused harm to Plaintiff and members of the Class located, or operating in the United States, including this District.

10

63.    Venue is proper in this District under 15 U.S.C. §§ 15, 22 and 28 U.S.C. § 1391(b), (c), and (d). During the Conspiracy Period, one or more Defendants transacted business, were found, or had agents in this District. A substantial part of the events giving rise to Plaintiff's claims occurred in this District, and a substantial portion of the affected interstate trade and commerce was carried out in this District.

64.    Defendants' conduct, as alleged herein, substantially and foreseeably affected interstate commerce in the United States, including in this District.

65.    Defendants sell Conventional Eggs in the continuous and uninterrupted flow of interstate commerce, including in this District.

## IV.    FACTUAL ALLEGATIONS

### A.    Background

#### 1.    Eggs Are a Vital Consumer Good that is Inelastic

66.    Eggs are a staple food in the United States.

67.    Not only are eggs an integral part of an American breakfast, but they are also an essential ingredient in baking and numerous other dishes from sauces to cocktails. Eggs are used and consumed in homes and restaurants throughout America.

68.    The U.S. Department of Agriculture has described eggs as "among the most nutritious foods on earth."[11] As reported by the American Heart Association, "eggs are an efficient, rich source of protein and vitamins" and are linked to promoting healthy metabolism, liver function, and fetal brain development.[9]

---

[9] U.S. Dep't of Agriculture, Food Safety & Inspection Serv., "Shell Eggs from Farm to Table," available at https://www.fsis.usda.gov/food-safety/safe-food-handling-and-preparation/eggs/shell-eggs-farm-table (last visited Apr. 15, 2026).

11

69.     On average, American consumers eat about 280 eggs each per year. Egg consumption remains comparatively steady because demand for eggs is relatively inelastic. Consumers do not purchase fewer eggs when prices rise. Moreover, there are no substitutes for eggs. Purchases cannot switch to other products to make the price increase unprofitable for producers.

### 2.     The U.S. Egg Industry is Massive

70.     According to an analyst, the egg market in the United States is worth approximately $10 billion. American egg producers ship about 100 billion eggs per year.

71.     Eggs are produced nationwide, with most states contributing significantly including Wisconsin. Production in the United States is concentrated in the Midwest. The top five egg producing states—Iowa, Ohio, Indiana, Pennsylvania, and Texas—represented nearly half of all laying hens in 2024.



*USDA Egg Production Chart, 2024*[10]

72.    Egg Producer Defendants market and sell their eggs throughout the United States and compete with each other in a national market. Food products such as eggs are regulated at a national level, such that Defendants would not be constrained by regional or statewide geographic factors in selling its products to customers.

73.    In 2024, egg producers in the United States produced approximately 258 million cases of shell eggs (over 7 billion dozen). The vast majority of egg production is consumed domestically, with only 5.5 million cases of shell eggs exported in 2024.



### 3.    The Conventional Eggs Market and Egg Production

74.    The United States egg industry produces eggs for two primary uses: (1) whole shell eggs sold primarily to retail customers (the "shell egg" or "table egg" market) and (b) pasteurized eggs sold without the shell in liquid or dried form primarily to restaurants, cafeterias, and food

---

[10] https://perma.cc/3XGD-R94J.

manufacturers (the "breaker" market). Historically, about 70% of layer hens produced eggs for the shell egg market, while the remaining 30% of layers produced eggs for the breaker market.

75.    A vast majority of shell eggs produced in the United States fall into the category of **Conventional Eggs**. Conventional Eggs are standard white or brown eggs that are produced in non-specialty systems and sold through retail and food service channels.

76.    A minority of the shell eggs produced in the United States fall into the category of specialty eggs, such as cage-free, organic, free-range, or pasture-raised eggs. Conventional eggs are distinct from specialty eggs. Specialty eggs are sold at premium prices based on specific animal-welfare, environmental, or certifications criteria. Conventional eggs, on the other hand, are the industry standard product and constitute the vast bulk of all eggs sold in the United States.

77.    Shell egg production is part of the broader poultry production industry. Poultry production begins with birds known as primary breeders. Primary breeder flocks consist of elite (also referred to as pedigree or foundation) birds, great-grandparent birds, and grandparent birds. Grandparent flocks produce the final generation of breeding birds. These final generation flocks are known as multiplier/parent flocks. Eggs from multiplier flocks hatch to become production birds—either broilers (chickens for human consumption) or egg-laying hens (also called "layers" or "layer hens"). Broilers are shipped to production farms within a day of hatching, where they are raised for meat. On multiplier farms for egg production, the chicks are sent to be raised on pullet farms (farms that raise young female chickens, also known as pullets) until they reach egg-laying age (about 19 weeks old). The pullets are then transported to egg production farms, while male chicks are culled (or removed) shortly after hatching.

14

78. Typically, the egg production cycle is not volatile or subject to sudden, unmanageable shifts. Accordingly, egg output can be forecasted and adjusted with great precision barring any catastrophic events.

79. This makes it possible for producers to intentionally reduce supply, delay new flocks, or retire hens early. If these actions were taken collectively by egg producers, it can artificially constrain the supply of eggs and increase prices.

80. For example, production can be reduced or delayed through molting. As hens age, egg production declines. When production falls to approximately 50 percent—typically around 60-70 weeks of age—producers may choose to molt the flock (a process in which chicken shed old feathers and regrow new feathers). Molting halts egg production for roughly eight weeks while hens regrow feathers, after which production temporarily increases. Molting therefore reduces short-term supply but can extend the productive life of a flock.

81. Hens may be molted a second time before ultimately becoming what is referred to as "spent hens." Spent hens, typically between 100 and 130 weeks old, are depopulated once they can no longer produce eggs at profitable levels.

82. Egg producers also maintain cold storage capacity as well. Cold storage capacity allows for inventory management. It can also allow egg producers to further distort apparent supply levels in the market. Producers have the ability to withhold eggs from the market during times of low prices or release excess inventory when market prices are favorable.

83. Eggs are collected on belts and transported to storage coolers or egg-processing centers. Eggs usually reach a processing center within twelve to fourteen hours after laying, where they are washed, inspected for cracks or defects, graded, and packaged for sale or further processing.

15

### 4.    Conventional Eggs Are a Commodity Product

84.    Conventional eggs are highly interchangeable and therefore are considered a commodity product. The Conventional Eggs produced and marketed by Defendants are nearly identical in terms of quality, appearance, and use. This makes them fungible in the eyes of customers and indirect consumers.

85.    Government grading and sizing standards also make Conventional Eggs functionally equivalent. The USDA establishes Consumer Grades for Conventional Eggs, such as Grade AA, Grade A, and Grade B. The Consumer Grades are based on specific interior and exterior quality factors. Sizes are standardized by weight per dozen, including Jumbo, Extra Large, Large, Medium, and Small. These government-mandated standards strip away most avenues for product differentiation. For example, a "Grade A Large" Conventional Egg from one producer, for all practical purposes, is identical and perfectly substitutable with a "Grade A Large" Conventional Egg from any other product.

86.    As interchangeable commodity products, Conventional Eggs are differentiated almost exclusively based on price.

### 5.    Defendants Use Consolidation and Vertical Integration to Dominate the Egg Industry

87.    Throughout most of the twentieth century the egg industry had a highly fragmented production structure that included thousands of independent farms.

88.    Today, the Egg Producer Defendants collectively control approximately 40% of all U.S. laying hens. Defendant Cal-Maine alone had over 50 million egg-laying hens in 2024, controlling approximately 20 percent of national egg sales. The Egg Producers achieved its industry domination through aggressive consolidation.

16

89.     For example, in 1988, Cal-Maine tripled its flock overnight by purchasing the entire egg division of Cargill (one of the world's largest privately owned agricultural businesses) to become the largest producer in the egg industry. In addition to Cargill, Cal-Maine has made at least twenty-five other acquisitions including:

| | |
|---|---|
| **1999** | Hudson Brothers, Inc., which added approximately 1.2 million laying hens; |
| **2008** | Tampa Farm Service, Inc. and Zephyr Egg Company, which added approximately 6 million laying hens; |
| **2012** | Pilgrims' Pride and Maxim Production Co., which added approximately 4.9 million laying hens. |
| **2016** | Foodonics International, which added approximately 3.1 million laying hens. |
| **2019** | Mahard Egg Farm, which added approximately 3.9 million laying hens. |
| **2022** | Red River Valley Egg Farm, which added 1.7 million laying hens. |
| **2023–24** | Fassio Egg Farms, Inc. and ISE America, Inc., which added approximately 5.9 million laying hens. |

90.     Cal-Maine (the only public company among the Egg Producer Defendants) is clear to its investors about its focus on a growth strategy through acquisitions, emphasizing in its investor materials the importance of a "[s]teady flow of M&A opportunities."[11]

91.     Other Egg Producer Defendants have used the same aggressive consolidation strategy as Cal-Maine through a series of mergers and acquisitions to become the dominant egg producers they are today.

92.     For example, in 2020, Rose Acre announced it entered a joint venture with Weaver Brothers Inc. to purchase Opal Foods. At the end of 2019, Opal Foods had nearly 8 million laying hens.

---

[11] Cal-Maine Foods, "Investor Presentation Q4 FY2025" (July 2025), available at https://irp.cdn-website.com/79e86203/files/uploaded/CALM_FY25_2Q_Investor_Presentation_Accessible.pdf.

17

93.     In 2016, Versova grew its capacity by acquiring Willamette Egg Farms—adding over 3 million laying hens—and Rembrandt Foods (now known as Ovation Farms) in 2021.

94.     In 2023, Daybreak acquired Hen Haven, LLC and Schipper Eggs, LLC which brought its operation to over 19 million laying hens. It further expanded in 2022 when it acquired Konos, Inc. (d/b/a Vande Bunte Eggs).

95.     This year, Hillandale Farms was acquired by Luxembourg-based company Global Eggs for over $1 billion. Global Eggs operates large egg producers around the world and has combined revenues of over $2 billion.

96.     Egg Producer Defendants also exercise control over the industry through vertical integration by which Egg Producer Defendants can control each stage of production. They own breeder flocks, operate multiplier and pullet farms, manufacture feed, run in-house grading and breaking facilities, and maintain dedicated trucking fleets.

97.     For example, in addition to its 50 million laying hens and 49 egg production facilities, Cal-Maine also hatches the majority of its chicks on its own multiplier farms and grows them in its own pullet farms. When the chickens reach egg-laying age (19 weeks old), Cal-Maine then transports about 90% of the hens to its own production farms while about 10% are delivered to contracted farms. At both kinds of farms, the hens are fed from Cal-Maine's 30 feed mills. After the hens lay eggs, Cal-Maine cleans, grades, and packages them at its own packing facilities for sale as shell eggs or breaks and transforms them into liquid, frozen, or dried form at its own processing facilities for sale as broken egg products. Finally, Cal-Maine prepares its table-eggs and broken egg products to be picked up by customers or ships them to customers' warehouses and retail stores with its own fleet of delivery trucks, or with contracted trucks.

18

98.     Cal-Maine is even further integrated and maintains two breeding facilities with over 10 million birds.



*Cal-Maine Investor Presentation*

99.     This gives Cal-Maine leverage over the replenishment stock that rivals who do not have the same amount of breeding capacity need. In a presentation to investors, Cal-Maine stated that it has the capacity of producing about 8.1 million eggs per hour.

100.    Rose Acre similarly has a breeder flock. Egg producers without breeder flocks must source replacement hens for their egg production either from Cal-Maine and Rose Acre or from a two-firm genetics duopoly—Hendrix Genetics and EW Group—further narrowing their options.

101.    Hendrix Genetics and EW Group are two companies which control the "parent flock" which produces almost the entire supply of pullets sold downstream to egg producers.

102.    This duopoly at the top of the egg production supply chain functions as a structural bottleneck in the egg market which helps facilitate the producer-level conspiracy. The genetics firms, acting in their own independent, profit-maximizing interest (i.e., restricting pullet supply to keep pullet prices high), have the effect of protecting the Egg Producer Defendants' downstream collusive arrangement. Their actions, whether coordinated with

19

producers or not, create a risk of input foreclosure, preventing other producers from easily expanding supply and stopping new entrants from competing away the supracompetitive egg prices.

103.    Input foreclosure is an anti-competitive practice where a vertically integrated company withholds, raises the price of, or degrades the quality of a critical input to harm its rivals in the downstream market.

104.    Beyond these risks, the smaller companies also do not have equal access to pullets to rebuild their flocks as quickly as the most dominant firms with breeding programs.

### 6.    The Urner Barry Pricing Benchmarks (Incorporating ECI Data) Are the Basis for Industrywide Conventional Egg Contract Prices

105.    The vast majority of Conventional egg sales in the United States are made under contracts between egg producers and their customers, including retailers, distributors, and food service companies.

106.    These contracts frequently use formula pricing, under which the price for each shipment or transaction is tied directly to an external benchmark quotation. Once the parties agree on the formula, contract prices fluctuate automatically with movements in the benchmark.

107.    Formula pricing has long been recognized as a vulnerability in commodity markets. When a market is dominated by a small number of large producers and transactions are tied to a single benchmark, producers have both the incentive and the ability to influence the benchmark price through coordinated changes in their conduct.

108.    Most other agricultural commodities like soy, coffee, and sugar are traded on transparent public exchanges. In contrast, eggs lack a regulated exchange and price discovery has effectively been delegated to (i) Urner Barry, which issues egg quotations ("UB quotes" or "Urner Barry quote") which serves as a *de facto* pricing benchmark for eggs nationwide; and (ii) to ECI,

20

a members-only platform which publishes trading-based prices among producers and serves as an information exchange and contract-setting tool for large-scale transactions.

1.      In the Conventional Egg market, formula prices are typically based on the daily wholesale quotations published by Urner Barry (now known as Expana) in its Price-Current report, a trade publication that serves as the bellwether for egg contracts nationwide. Urner Barry also publishes benchmarks or indexes that condense its reported quotations into numeric benchmarks used in commercial contracts. UB quotes have been the industry's benchmark for over a century.

2.      Defendants and their co-conspirators were well aware that Urner Barry's Price-Current reports and indexes served as the *de facto* bellwether for egg pricing nationwide.

3.      A majority of wholesale egg contracts are based on UB quotes as the reference price, meaning even small increases in reported values immediately translate into higher prices for purchasers.

4.      Cal-Maine's annual SEC filings during the Class Period confirm that "the majority of [Conventional Eggs] sold in the U.S. in the retail and foodservice channels are sold at prices that take into account quoted wholesale market prices, such as those published by Urner Barry."

5.      Urner Barry compiles its daily reports by soliciting confidential information from producers, distributors, brokers, and buyers—including Egg Producer Defendants—regarding transaction prices, bids, and offers. Urner Barry also takes into account prices gleaned from the Egg Clearinghouse, but as Karyn Rispoli, a managing editor at Urner Barry, said on a 2024 podcast, "[Egg Clearinghouse] rarely paints the entire picture, and that's where we [Urner Barry] come in."

6.      Urner Barry's reporters collect data by telephone, e-mail, text message, and instant messaging from 8:45 a.m. to 5:00 p.m. Eastern each business day.

7.      Because virtually all commercial egg transactions reference Urner Barry's numbers, even modest movements in Urner Barry's daily quotation cause the near-instant repricing of billions of eggs in the pipeline. Urner Barry's centralization of this data and near instant access to it due to technological advances in the internet age give Defendants a powerful incentive to influence the benchmark prices.

8.      Urner Barry claims to follow an "IOSCO-compliant" methodology that is supposed to prioritize reliable, impartial pricing data. IOSCO is an international body that regulates security markets. An Urner Barry spokesperson stated that "We [Urner Barry] guard against the risk of manipulation by adhering to the IOSCO methodology."

9.      Urner Barry is audited every year by the accounting firm BDO USA P.C. ("BDO") for compliance with IOSCO standards. While Urner Barry claims that it has "passed every audit," recent reports suggest that BDO is not a reliable accounting firm. In 2023, BDO was sanctioned by the Public Company Accounting Oversight Board ("PCAOB") for violations of PCAOB rules and audit standards.[12] On top of that, "[t]wo-thirds of [BDO's] audits picked for inspection fell short of US standards."[13]

10.      In addition to its daily market quotations, Urner Barry also publishes forward-looking egg market forecasts. These forecasts provide outlooks on future supply, demand, and pricing trends, drawing on predictive inputs such as eggs in incubators, chicks hatched, intended placements, rate of lay, along with other factors. Urner Barry advertises these reports

---

[12] https://bit.ly/47NCIoQ.

[13] https://bit.ly/4pc3PkL.

22

as tools that allow subscribers to "identify trends before they happen" and "create sound business strategies."[6]

11.     Urner Barry incorporates transaction prices from the ECI spot market into its price quotes. ECI is the industry's sole organized spot market for shell eggs. So, while less than 5% of egg transactions occur there, ECI prices play an outsized role in Conventional Egg pricing.

12.     The relatively small number of transactions on the ECI, combined with Defendants' dominant market position with respect to smaller producers, have enabled Egg Producer Defendants to easily influence the volume and pricing on the ECI platform, which are then incorporated into the Urner Barry quote. The dominant firms did not need to coordinate with hundreds of fringe producers; they only needed to coordinate among themselves in a way that artificially inflated the ECI prices.

13.     Defendants' collusion is further supported because the ECI is a member-only platform comprised of farmers and ECI's egg buyers' board. Historically, the board included industry executives (including Cal-Maine's founder), underscoring close producer involvement in the information channel that feeds benchmarks.

109.    Urner Barry and ECI amplify price swings led by the largest-volume producers—including Egg Producer Defendants—and prevent independent, competitive decision-making by others.

### B.     Defendants' Anticompetitive Conduct

110.    The United States egg industry historically has had relatively stable prices which only fluctuated in a narrow range for most of the 20th century. However, since the industry's rapid consolidation beginning in the 1980s, as described above, the industry has been increasingly characterized by production rigidity, both in the fact of rising prices and declining prices.

23

111.    Then, following supply shocks during the Covid-19 pandemic in 2020, Defendants broke this pattern and increased egg prices to record highs, reaching $6.23 per dozen in March 2025.

112.    Egg Producer Defendants claim that HPAI outbreaks beginning in late 2021 caused this increase in egg prices. However, the extreme rises exceed what the losses of flocks due to bird flu alone would justify. Instead, the evidence suggests the Egg Producer Defendants conspired to coordinate and manipulate pricing benchmarks—using Urner Barry's and ECI's published reports as the catalyst—leading to supracompetitive prices.

**1.    Defendants Conspired to Raise Egg Prices Using the Urner Barry Index (and ECI data Incorporated Therein)**

113.    Defendant Urner Barry's published daily wholesale quotations anchor egg pricing.

114.    This structural feature of the egg market ensures that any inflation in Urner Barry's benchmark prices rapidly transmit throughout the entire industry. Over 95 percent of eggs are sold pursuant to contracts pegged to Urner Barry's quotations, and fewer than 5 percent of eggs are sold on the ECI spot market (which Urner Barry also takes into account). Cal-Maine, for example, acknowledged in a press release that "a majority of [its] conventional eggs are sold based on market quotes published by Urner Barry." Thus, even modest artificial increases in reported prices cascade into higher prices for nearly every downstream transaction.

115.    Urner Barry's quotations are inherently susceptible to manipulation because they are substantially based on self-reported and nonpublic transaction data from dominant firms, including the Egg Producer Defendants. Indeed, the quotations depend heavily on what producers choose to report, giving Egg Producer Defendants significant influence over the benchmark. The Egg Producer Defendants can, and do, push Urner Barry's benchmark upward by submitting elevated prices, knowing that the new higher prices will automatically be applied

24

to future contract deliveries creating a self-reinforcing feedback loop—elevated benchmark prices increase the revenue received on each sale that, in turn, increases the baseline for the next round of reporting. The system thereby amplifies any upward movement and resists downward price corrections, particularly in a concentrated market where the largest players account for approximately 40 percent of all production.

116. The opportunities for manipulation are exacerbated by the fact that most eggs sold in the United States are Conventional Eggs, whose prices are almost universally tied to Urner Barry quotations. Specialty and cage-free eggs—whose prices are more often linked to actual production costs under long-term contracts—did not experience nearly the same magnitude of price spikes during the conspiracy period.

117. For example, in the five months prior to the 2021 HPAI outbreak, cage-free eggs averaged $0.65 more per dozen than conventional eggs, reflecting higher production costs. By 2022, however, Conventional Egg prices—driven by Urner Barry indices—rose so sharply that *they exceeded cage-free prices by $0.33* on average. In 2023 and 2024, cage-free eggs were only 17% and 2% higher than conventional eggs, respectively.

118. Historical precedent underscores the risks inherent in such a system. In the poultry and other meat industries, companies have been accused of using price reporting agencies like Urner Barry to facilitate anticompetitive information sharing.

119. The same vulnerabilities exist in the egg market. Urner Barry's methodology allows for selective reporting, and the company does not verify every transaction reported by industry participants. Instead, it aggregates and "scrutinizes" the information according to its own proprietary methods, the details of which are not subject to public oversight.

25

120.    This opaque process invites abuse and the cartelization of the relevant market. The Egg Producer Defendants can monitor each other's reported prices, verify them to coordinate price levels, and punish deviations by reverting to benchmarking-linked pricing in subsequent transactions.

121.    The correlation between Urner Barry's quotations and Conventional Egg price spikes, combined with the absence of competitive market discipline, supports a strong inference that Defendants used the Urner Barry system to communicate, monitor, and enforce supracompetitive pricing.

122.    In this way, Urner Barry served as both the hub for exchanging competitively sensitive pricing information and the enforcement mechanism for maintaining elevated price levels. This dual role magnified the anticompetitive harm, depriving the marketplace of independent price setting and ensuring that the benefits of inflated prices were collectively accrued to the Egg Producer Defendants.

123.    The vertical integration of the Egg Producer Defendants further strengthens the effectiveness of this arrangement. With control over breeding, production, processing, and distributions, these firms could maintain tight supply discipline while ensuring that all their sales—across all stages—reflected Urner Barry's elevated benchmarks.

124.    Because of the Defendants' market concentration, deviations from Urner Barry's benchmarks could be swiftly detected and addressed. Any short-term gain from discounting would be outweighed by the risk of retaliation in future transactions, making adherence to coordinated prices the rational choice for all conspirators.

125.    The conduct described herein is inconsistent with unilateral, competitive behavior. It is instead indicative of a coordinated strategy, implemented through a centralized price reporting

system, to fix, raise, and maintain egg prices at artificially high levels in violation of the Sherman Act and state antitrust and consumer protection laws.

### 2. Defendants Reaped Substantial Profits as a Result of Their Conspiracy to Increase Prices

126. The price increases resulting from Defendants' price coordination have generated extraordinary profits for the Egg Producer Defendants.

127. Cal-Maine, for example, reported gross margins approaching 40% during the conspiracy period, and in some quarters, profits increased by nearly 950% compared to pre-2022 levels.

128. These profits came directly at the expense of egg purchasers, including Plaintiff and members of the Commercial Indirect Purchaser Class, who paid vastly more for eggs than they would have in a competitive market.

### 3. The Egg Price Increases Cannot Be Explained by Market Conditions

129. The Egg Producer Defendants have claimed price increases of Conventional Eggs were the result of an increase in price of the inputs required to produce against, and the loss of flocks due to HPAI.

130. However, these market conditions cannot explain the increase in the price of Conventional Eggs during the Class Period. Instead, Defendants used them as pretexts to justify their unlawful price coordination.

### i. The Price of Inputs Cannot Explain the Increase in Egg Prices

131. The Egg Producer Defendants have publicly stated that increases in the price of feed, energy, and other inputs have contributed to higher prices for Conventional Eggs. However, cost data do not support these claims.

27

132.    Feed, primarily corn and soybean meal, is the primary cost component in shell egg production, which accounts for more than half of productions costs. Fuel costs, typically propane or natural gas, is another input to poultry farming.

133.    Data from the U.S. Bureau of Labor Statistics show that these cost inputs have *decreased* since 2022. Cal-Maine's financial disclosures confirm that production costs have gone down, not up, as Cal-Maine's profits have skyrocketed.

134.    Under competition, one would expect price paths to track costs and supply shocks. That has not been the case in the shell egg market. Instead, prices and costs have diverged, to the profit of shell egg producers.

### ii.    Avian Flu Outbreaks Do Not Explain the Increase in Egg Prices

135.    Defendants have blamed the spread of HPAI for higher eggs prices. In reality, however, HPAI does not explain the unprecedented surge in egg prices. Defendants have used HPAI as a pretext to justify their coordinated price increases.

136.    The 2022 HPAI outbreak was not the first time the egg industry had been hit by a massive bird flu outbreak. Another such outbreak occurred in 2015. Comparing the market effects of the two outbreaks demonstrates that HPAI is a pretext for Defendants' unlawful price coordination.

137.    The monthly reduction in the egg-laying flock size since 2022 was similar to those in 2015, when avian flu killed 43 million egg-laying hens. Nevertheless, prices since 2022 have risen more than three times more per lost hen than they did during the earlier outbreak.

138.    Data from the USDA, National Agricultural Statistics Service (NASS) and U.S. Bureau of Labor Statistics (BLS) Consumer Price Index Average Data for dozen large eggs, as shown in Figure 1 below, demonstrates the staggering price differences between the 2015 and 2022 outbreaks, and shows that the dramatic price hikes that began at the onset of the 2022 HPAI

28

outbreak occurred in the face of relatively stable egg production compared to the more severe and prolonged shortage in 2015.



**Figure 1[14]**

139.    Average wholesale egg prices compared to egg-laying hen inventory, as shown below in Figure 2, lend further support to Defendants using the recent HPAI as a pretext to justify their coordinated pricing activity where, despite relatively stable inventory, wholesale egg prices have soared compared to those in 2015.

---

[14] https://www.congress.gov/crs-product/IF12949#iag.aspx?prodCode=IF12949&iag=IAG-2074238648.

29



**Figure 2**[15]

140.    Analysts and consumer advocates have noted that bird flu losses in recent years have been insufficient to explain the magnitude of the price spikes. Hunterbrook's analysis of USDA data found that the effective reduction in the national hen flock was only about 1% compared to 2021, yet average wholesale prices rose 127% in 2022. Average wholesale prices rose 54.6% in 2023—a 17% increase in price per 1% decrease in supply—and 127.7% in 2024—a 25% increase in price per 1% decrease in supply.

141.    Indeed, from 2022 through 2024, price increases per unit of supply loss were three to four times greater than during the 2015 avian flu outbreak—a disparity that cannot be explained by legitimate cost or demand changes.

142.    Moreover, the Egg Producer Defendants were able to repopulate quickly relative to the 2015 outbreak due to their large size and vertical integration. For example, Cal-Maine lost a total of 3.7 million chickens to avian flu in two of its facilities in Kansas and Texas in December 2023 and April 2024, but by early November had added 8 million hens to its flock, more than

---

[15] https://hntrbrk.com/big-egg/.

recovering from its losses in just six months. In fact, Cal-Maine's total flock was actually 15% *higher* than it was before 2022.

143.     A key distinction from the 2015 HPAI episode is the unusually slow recovery of the layer flock. This slow response may be explained by structural constraints in the pullet pipeline originating from the upstream genetics duopoly. During the 2022–2024 "crisis," the parent flock—which produces the replacement layer hens—was itself dramatically reduced, from 3.1 million in 2021 to 2.5 million in 2025.

144.     This upstream bottleneck explains how a producer-led conspiracy could have remained durable. This "managed scarcity" prevented normal market correction (i.e., new entry or expansion) that would have otherwise competed away supracompetitive prices.

145.     Additionally, the actual domestic egg supply fell even less than the flock size, due to a significant reduction in egg export and an unprecedented increase in laying rate per hen, owing to improved genetics.

146.     A comparison of the HPAI situation in the United States to supply shortages in Europe also illustrates that the HPAI outbreak was a pretext for Defendants' coordinated price conduct. Europe also saw a massive supply shortage in 2022 after 50 million layers were depopulated—compared to 43 million in the U.S. And yet, prices only rose about 30% in Europe from January 2022 to January 2023, compared to nearly 170% in the U.S.

### 4.     United States Department of Justice Has Investigated the Same Coordinated Price Conduct

147.     On March 6, 2025 various news outlets, including The Capitol Forum and The Wall Street Journal, reported that DOJ was investigating whether egg producers—including Defendants Cal-Maine and Rose Acre—had conspired to raise prices of eggs. According to the reporting, DOJ sent letters to egg producers that asked the egg producers "to preserve documents about their

pricing conversations with customers and competitors," as well as communications with Urner Barry.

148.    In a 10-Q SEC filing published April 8, 2025, Defendant Cal-Maine confirmed it was under investigation by DOJ. In that filing it stated that it received a civil investigative demand from DOJ in March 2025.

149.    After the investigation became public in or around March 2025, egg prices dropped precipitously. For instance, on March 5, the average wholesale cost of a dozen large grade A white eggs was $8.12. On March 19, about two weeks after DOJ's investigation became public those same eggs cost $3.03—a 62.7 percent decrease. Egg prices at retail also dropped around this time. The speed and magnitude of the price drop strongly suggest that prior egg prices were sustained through coordinated conduct, rather than competitive market forces.

150.    The DOJ subsequently announced, in April of 2026, that it is preparing to file a lawsuit against the dominant egg producers, including Defendants Cal-Maine and Versova, for increasing prices in 2024 and 2025 through collusion.

### 5.    Defendants' Prior Anticompetitive Conduct and Unfair Business Practices

151.    The egg industry, including several of the Defendants named here, have previously been targeted by private litigants for anticompetitive and unfair business practices, including in *In re Processed Egg Products Antitrust Litigation*, No. 08-md-2002 (E.D. Pa.), where Cal-Maine and Hillandale settled the claims for millions of dollars, and *Kraft Foods Global, Inc. et al. v. United Egg Producers, Inc. et al.* (N.D. Ill.), where the jury returned a $17.8 million dollar verdict (before trebling) on Kraft's price fixing claim.

152.    Defendants have also been targeted by government enforcers. In 2020, the New York Attorney General alleged that Hillandale Farms exploited the COVID-19 pandemic to charge

32

"unconscionably excessive" prices, justified by Urner Barry's indices, which themselves were based on data supplied by the industry. In 2021, Alaska accused Urner Barry of aiding broiler producers in an "anticompetitive output restriction scheme" by serving as a conduit for competitively sensitive information and facilitating production cuts.

### 6. "Plus Factors" in the Conventional Egg Industry Provide Additional Evidence of Defendants' Conspiracy to Increase Conventional Egg Prices

153.    Prominent legal and economic antitrust scholars studying collusive behavior have identified certain "plus factors," which are "economic actions and outcomes, above and beyond parallel conduct by oligopolistic firms, that are largely inconsistent with unilateral conduct but largely consistent with explicitly coordinated action," and therefore support an inference of collusion[16]. The plus factors are circumstantial evidence that supports active collusion, as opposed to mere conscious parallelism. These plus factors consider such evidence as the actions and conduct of the Defendants, and the structure of the industry that make it susceptible to the type of coordinated price conduct alleged here.

154.    There are several plus factors here to support the plausible inference that Defendants are members of a *per se* unlawful price fixing cartel. These include: (1) Defendants' exchange of competitively sensitive information; (2) a price-verification scheme; (3) a motive to conspire; (4) opportunities and invitations to collude; (5) an increasingly concentrated market; (6) high barriers to entry; and (7) a commodity product.

---

[16] William E. Kovacic, *Plus Factors and Agreement in Antitrust Law*, 110 Mich. L. Rev. 393, 393 (2011).

### i. Defendants Shared Competitively Sensitive Information through the Urner Barry Index

155.    As described in detail above, Defendant Urner Barry compiles daily market reports by soliciting private pricing information from producers, distributors, brokers, and buyers—including the Egg Producer Defendants—regarding transaction prices, bids, and offers.

156.    Egg producers, such as the Egg Producer Defendants, can maximize their prices by matching the benchmarks Urner Barry calculates based on the transaction data it receives.

157.    The data Urner Barry uses to calculate its benchmarks is data that would normally be kept confidential, given its competitively sensitive nature. An egg producer would be competitively disadvantaged by sharing such private data unilaterally. Accordingly, a rational actor would only do so with the expectation that it will benefit from similar private information shared by its competitors.

158.    Moreover, since it is well known in the egg industry that over 95% of eggs are sold pursuant to contracts pegged to Urner Barry's price quotations, each individual Egg Producer Defendant can be reasonably certain that the other Egg Producer Defendants are supplying their competitively sensitive information to Urner Barry and are using the pricing benchmarks Urner Barry provides to maximize their egg prices.

### ii. Defendants Engaged in Price Verification

159.    Urner Barry provides participating egg producers with a price-verification scheme, or "the practice of a seller reporting to its competitors the details of completed transactions with specific customers."

160.    With Urner Barry, egg producers, such as the Egg Producer Defendants, are able to see benchmarks that measure where an egg producer stands in relation to others in their market.

34

These benchmarks are based on actual transactions. This type of price-verification makes little sense absent collusion.

161. The risk of collusion is further heightened because Urner Barry disseminates forward-looking forecasts to its subscribers. By jointly relying on the same projections of future supply, demand, and pricing, the Egg Producer Defendants could align their expectations and production plans around shared market outlooks—coordinating not only current pricing but anticipated future conditions. Such forward-looking data magnifies the anticompetitive potential of Urner Barry's system by enabling the Egg Producer Defendants to adjust production and pricing behavior in parallel based on common forecasts.

### iii.    Urner Barry Provides a Motive to Conspire

162. Urner Barry provides egg producers, including the Egg Producer Defendants, with a motive to conspire by advertising that Urner Barry provides valuable information to support maximizing profits.

### iv.    Defendants Had Ample Opportunities to Conspire

163. Egg Producer Defendants are involved in multiple industry trade associations and regularly attend trade meetings that give them ample time and opportunity to coordinate supply restraints and price and curtail cheating on the conspiracy.

164. The Egg Producer Defendants are members of UEP and AEB (American Egg Board), national trade associations that represent large U.S. egg producers. These associations host regular meetings, conferences, and committee gatherings that bring together high-level executives from competing firms, providing a forum for illegal discussions and coordination among the Egg Producer Defendants.

165. For example, since 2021, the AEB and UEP have hosted an annual joint conference that Egg Producer Defendants attended.

35

166. Further, employees of the Egg Producer Defendants have been on the board of UEP. For instance, In October 2023, Sherman Miller (CEO of Cal-Maine Foods) was elected Treasurer of the Board of UEP for 2024, and Marcus Rust (CEO of Rose Acre Farms) was elected as a representative at-large. The presence of senior executives from multiple Egg Producer Defendants in UEP's top leadership provides a continuing forum for regular communication and alignment among competitors.

167. Trade associations also create and disseminate "guidelines," "certification programs," and industry data that can be used as vehicles to orchestrate and monitor a collusive scheme. In fact, "at trial, the most important part" of the adjudicated conspiracy in Kraft was the "UEP Certified Program," which aided producers such as Cal-Maine and Rose Acre in restricting the supply of eggs. UEP Certified is still in force today.

168. Additionally, Urner Barry hosts an annual Executive Conference which employees of Defendants have attended during the Class Period, including employees of Rose Acre, Daybreak, and Urner Barry. Urner Barry markets this event as "a must-attend event for decision-makers in the protein industry . . . Where the protein industry's most influential members go to network, learn and advance their professional development." Employees of Defendants have even been seen together at these conferences. Urner Barry and Rose Acre employees were photographed together at the 2011 conference. In 2021, Bill Rehm, CEO of Daybreak, was a guest speaker at the conference. Finally, Defendants, including Cal-Maine, have sponsored this event in the past.

169. Trade association membership and industry events provide Defendants with ample opportunities to collude.

### v. The Egg Production Industry Is Highly Concentrated

170. A conspiracy is easier to effectuate, maintain, and enforce in a more concentrated industry.

36

171. As described above, the egg industry has increasingly become more concentrated.

172. While the industry was once highly fragmented, in recent years large egg producers—primarily the Egg Producer Defendants—have grown exponentially through acquisitions.

### vi. Egg Producers Face Significant Barriers to Entry

173. Egg producers face significant entry barriers that include financial, regulatory, operational, and logistical costs.

174. Potential new entrants will have to expend significant money on up-front capital expenditures, including land acquisition, construction of specialized poultry houses, and purchases of feeding, watering, climate control, and waste management equipment.

175. Potential new entrants would also need to displace long-standing customer relationships. Thus, new entrants into the market are unlikely to disrupt or discipline Defendants' cartel pricing.

### vii. Conventional Eggs Are Inelastic Commodity Products

176. Conventional Eggs are a fungible commodity with minimal product differentiation, a market characteristic that greatly simplifies the formation and maintenance of a price-fixing conspiracy.

177. When products are homogenous, firms compete primarily on price. This creates a powerful incentive to collude, as price competition in a commodity market can be destructive to profits. By agreeing to fix prices or restrict output, competitors can avoid price wars and collectively exercise market power.

178. As described above, Government grading standards make Conventional Eggs functionally identical, eliminating non-price competition and simplifying the detection of price deviations.

179. Conventional Eggs also exhibit relatively inelastic demand—i.e., consumers purchase similar quantities regardless of price fluctuations. Indeed, demand for eggs remained steady throughout the higher prices during the Class Period.

180. As one Cal-Maine investor presentation noted, "The price of eggs in relation to the overall amount we spend on groceries does not matter. A $1-$2 increase in an item we purchase once a month is not that big of deal in the grand scheme of things."[17]

181. Because of this price inelasticity, the structure of the egg production market makes the egg industry particularly susceptible to price manipulation. Small artificial reductions in supply can yield disproportionately large increases in price and profit for producers, including the Egg Producer Defendants.

## V.    ANTICOMPETIVE EFFECTS & DAMAGES

182. Defendants' anticompetitive conduct has had the following effects, among others:

a. Price competition among the Egg Producer Defendants for Conventional Eggs has been restrained or eliminated;

b. Prices for Conventional Eggs sold by the Egg Producer Defendants and their divisions, subsidiaries, affiliates, or co-conspirators, in turn, have been raised, fixed, maintained, or stabilized at artificially high, noncompetitive levels;

c. purchasers of Conventional Eggs have been deprived of free and open competition; and

d. purchasers of Conventional Eggs have paid artificially inflated prices.

183. The ultimate purpose of Defendants' and their co-conspirators' conduct is to raise, fix, maintain, or stabilize the price of Conventional Eggs and, as a direct and foreseeable result, Plaintiff and Class Members have paid supra-competitive prices for Conventional Eggs during the Class Period.

---

[17] *See* Cal-Maine 2Q 2025 Investor Presentation, *supra* n.2, at 5.

184.    Generally accepted economic principles dictate that an overcharge at the top of a multi-level distribution chain will result in higher prices at every level of distribution below. Therefore, at least some portion of an anticompetitive overcharge will be passed on by intermediaries, such as distributors, to end users.

185.    Here, while direct purchasers of Conventional Eggs were the first to pay supra-competitive prices, some or all of the overcharges were passed along the distribution chain and absorbed by downstream purchasers, including Plaintiff and class members, when they purchased Conventional Eggs from distributors, wholesalers, or retailers for commercial use.

186.    These overcharges are exactly the type of injuries the Sherman Act and state antitrust and consumer protection laws were intended to forestall.

187.    Plaintiff and Class Members have sustained injury to their business or property, as a result of Defendants violations of the state antitrust and consumer protection laws.

188.    Commonly used and well-accepted economic models can be used to measure both the extent and the amount of the overcharge passed through the various levels of distribution. As a result, the economic harm to Plaintiff and class members can be readily quantified.

189.    Defendants' price fixing agreement and information exchange are *per se* unlawful, or, alternatively, are unlawful under either a quick look or rule of reasons analysis. Under the *per se* standard, and additionally where, as here, there are demonstrable anticompetitive effects, a relevant product and geographic market need not be defined. However, Plaintiff defines such markets below in case their allegations are ultimately analyzed under a quick look or rule of reason analysis.

## VI.    RELEVANT MARKET

### A.    The Relevant Product Market Is Conventional Eggs

190.    The relevant product market is the market for Conventional Eggs, also known as "shell eggs" or "table eggs." Shell eggs are fresh, uncooked, and in an intact shell. Most shell eggs are sold at retail outlets such as grocery and convenience stores.

191.    According to the USDA, in 2023, approximately 70% of eggs produced in the United States were sold as shell eggs. The remaining 30% of eggs produced in the United States were sold as egg products (i.e. shell eggs broken and sold in liquid, frozen, or dried form).

192.    Shell eggs are versatile and can be used in a wide range of culinary applications, including baking, frying, boiling, poaching, and scrambling. Because shell eggs are purchased fully intact, there are no limits to their culinary applications. Previously broken egg products like liquid eggs are often pre-mixed to combine the yolk and whites. By mixing the yolk and the whites, egg products' culinary applications are generally limited to making scrambled egg and the preparation of certain baked goods.

193.    Additionally, many egg consumers prefer the flavor and texture of freshly-cracked shell eggs over egg products. Egg buyers also value shell eggs because they generally do not contain additives, preservatives, or stabilizers, like egg products.

194.    "Conventional" shell eggs are differentiated from "specialty" shell eggs which include cage-free, organic, brown, free-range, pasture-raised, or nutritionally enhanced shell eggs. Conventional Eggs make up the majority of shell eggs sold in the United States. In 2024, Conventional Eggs held almost three-quarters of the U.S. shell egg market, followed by cage-free eggs at about 23.2 percent, and pasture-raised at less than five percent.

195.    Accordingly, there are no reasonable substitutes for Conventional Eggs, and they constitute a distinct product market.

**B.    The Relevant Geographic Market is National**

196.    The relevant geographic market is the United States. The Egg Producer Defendants produce and distribute eggs through locations across the United States and have increased Conventional Egg prices nationwide.

## VII.    CLASS ACTION ALLEGATIONS

197.    Plaintiff brings this lawsuit under Federal Rules of Civil Procedure 23(a), (b)(1) and (b)(2) on behalf of itself and as representative of a class of Commercial Indirect Purchasers seeking injunctive relief (the "Nationwide Injunctive Relief Commercial Indirect Class") defined as follows:

> All persons or entities who indirectly purchased Conventional Eggs from the Defendants and their co-conspirators in the United States from January 1, 2022, and to the present for their own business use in commercial food preparation.

198.    In addition, Plaintiff brings this lawsuit under Federal Rules of Civil Procedure 23(a) and (b)(3) on behalf of itself and all others similarly situated seeking damages as well as equitable relief, on behalf of the following class (the "Commercial State Law Damages Class"):

> All persons or entities who indirectly purchased Conventional Eggs from the Defendants or co-conspirators in Alabama, Arizona, California, Colorado, Connecticut, the District of Columbia, Florida, Hawaii, Illinois, Iowa, Kansas, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Dakota, Tennessee, Utah, Vermont, West Virginia, and Wisconsin from January 1, 2022 to the present for their own business use in commercial food preparation.

199.    Specifically excluded from both the Nationwide Injunctive Relief Commercial Indirect Class and the Commercial State Law Class (collectively, the "Commercial Indirect Purchaser Classes") are: Defendants; any of their officers, directors, or employees; any entity in which any Defendant has a controlling interest; any affiliate, legal representative, heir, or assign of any Defendant; any federal, state, or local governmental entities; any judicial officer presiding over this action and the members of his or her immediate family and judicial staff; any juror assigned to this action; and any co-conspirator identified in this action.

200.    Plaintiff reserves the right to modify these definitions or to propose subclasses, as appropriate, based on further investigation and discovery.

201.    **Numerosity**. Plaintiff does not know the exact number of members of the Commercial Indirect Purchaser Classes because such information is in the exclusive control of Defendants and co-conspirators. Due to the nature of the trade and commerce involved, there are most likely hundreds of thousands of members of the Commercial Indirect Purchaser Classes, geographically dispersed throughout the United States, such that joinder of all members of the Commercial Indirect Purchaser Classes is impracticable.

202.    **Typicality**. Plaintiff's claims are typical of the claims of the Commercial Indirect Purchaser Classes in that it and Commercial Indirect Purchaser Classes' members all purchased Conventional Eggs at artificially inflated prices. All members of the Commercial Indirect Purchaser Classes were damaged by the same wrongful conduct of Defendants and their co-conspirators, and the relief sought is common to the Class.

203.    **Commonality**. Questions of law or fact that arise from Defendants' anticompetitive conduct are common to the Commercial Indirect Purchaser Classes, including, but not limited to, the following:

42

a.   Whether Defendants and their co-conspirators engaged in a combination or conspiracy to fix, raise, maintain, or stabilize the price of Conventional Eggs in the United States;

b.   Whether such combination or conspiracy constituted violations of the Sherman Antitrust Act;

c.   Whether such combination or conspiracy violated the antitrust, unfair competition, and consumer protection laws of various states;

d.   Whether the conduct of Defendants and their co-conspirators, as alleged herein, caused injury to Plaintiff and other members of the Commercial Indirect Purchaser Classes;

e.   Whether Defendants caused Plaintiff and the members of the Commercial Indirect Purchaser Classes to suffer damages in the form of overcharges on Conventional Eggs indirectly purchased from the Defendants or their producing co-conspirators;

f.   The effect of Defendants' conspiracy on Conventional Eggs sold in the United States during the Class Period;

g.   The identity of the participants of the alleged conspiracy;

h.   The duration of the conspiracy alleged herein, and the acts performed by Defendants and their co-conspirators in furtherance of the conspiracy;

i.   Whether Defendants fraudulently concealed their misconduct;

j.   Whether Defendants' anticompetitive scheme inflated prices of Conventional Eggs above competitive levels;

k.   The appropriate measure of class-wide damages for the Commercial Indirect Purchaser Classes; and

l.   The nature and scope of injunctive relief necessary to restore competition in the Conventional Eggs market.

204.   **Predominance**. These and other questions of law and fact are common to the Commercial Indirect Purchaser Classes and predominate over any questions affecting only individual class members. In addition, Defendants have acted on grounds generally applicable to the Commercial Indirect Purchaser Classes, thereby making final injunctive relief appropriate with respect to the Commercial Indirect Purchaser Classes as a whole.

205. **Adequacy**. Plaintiff will fairly and adequately represent the interests of the Commercial Indirect Purchaser Classes and have no known conflict with any other members of the Commercial Indirect Purchaser Classes. Further, Plaintiff has retained competent counsel experienced in antitrust, class action, and other complex litigation.

206. **Superiority**. A class action is superior to the alternative of individual actions for the fair and efficient adjudication of this controversy. There will be no material difficulty in the management of this action as a class action. Prosecution as a class action will eliminate the possibility of repetitive litigation, and thus costly and duplicative efforts and expenses. In the same vein, proceeding as a class action has the benefit of providing injured persons with a method of obtaining relief for their claims that might not be economically feasible. In addition, the prosecution of separate actions would create the risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

207. **Injunctive Relief**. Defendants have acted or refused to act on grounds generally applicable to the members of the Commercial Indirect Purchaser Classes, making injunctive and corresponding declaratory relief appropriate with respect to these classes as a whole pursuant to Federal Rule of Civil Procedure 23(b)(2).

## VIII.  FRAUDULENT CONCEALMENT AND TOLLING

208. Plaintiff and members of the Commercial Indirect Purchaser Classes had neither actual nor constructive knowledge of the facts constituting their claim for relief. Plaintiff and Class Members did not discover and could not have discovered through the exercise of reasonable diligence, the existence of the conspiracy alleged herein until shortly before filing this action.

209.    Throughout the Class Period, Defendants effectively, affirmatively, and fraudulently concealed their anticompetitive agreement from Plaintiff and members of the Commercial Indirect Purchaser Classes.

210.    Plaintiff and members of the Commercial Indirect Purchaser Classes had no knowledge of the unlawful conduct alleged in this Complaint, or any of the facts that could or would have led to the discovery thereof, until March 2025, when news of the DOJ's investigation into egg prices broke.

211.    Due to Defendants' fraudulent concealment, any applicable statute of limitations affecting or limiting the rights of action by Plaintiff or members of the Commercial Indirect Purchaser Classes has been tolled during the period of such fraudulent concealment.

## IX.    CAUSES OF ACTION

### COUNT I

**Conspiracy to Fix Prices in Restraint of Trade in Violation of
the Sherman Act, 15 U.S.C. §§ 1, 3**
(On behalf of Nationwide Class for Injunctive and Equitable Relief)

212.    Plaintiff repeats the foregoing allegations as if fully set forth herein.

213.    From at least January 1, 2022, and continuing through the present, the Defendants formed an unlawful contract, combination, or conspiracy in unreasonable restraint of trade in violation of Sections 1 and 3 of the Sherman Act, 15 U.S.C. §§ 1, 3.

214.    The contract, combination or conspiracy consisted of an agreement among Defendants and their co-conspirators to fix, raise, stabilize, or maintain at artificially high levels the price of Conventional Eggs in the United States and involved the exchange of competitively

45

sensitive information between and among Defendants, causing anticompetitive effects without sufficient procompetitive justifications.

215. Defendants' conspiracy has had the following effects, among others: (a) price competition in the market for Conventional Eggs has been restrained, suppressed, or eliminated; (b) prices for Conventional Eggs produced by Defendants and their co-conspirators have been fixed, raised, maintained, and stabilized at artificially high, non-competitive levels throughout the United States; (c) Plaintiff and members of the Class who purchased Conventional Eggs indirectly from Defendants and their co-conspirators have been deprived of the benefits of free and open competition; and (d) purchasers of Conventional Eggs paid artificially inflated prices.

216. Defendants' activities constitute a *per* se violation of Sections 1 and 3 of the Sherman Act.

217. Defendants' conduct is also unlawful under either a "quick look" or rule of reason analysis because the agreement is anticompetitive with no valid procompetitive justifications. Moreover, even if there were valid procompetitive justifications, such justifications could have been reasonably achieved through less restrictive means of competition.

218. Defendants' production restrictions, price-fixing, and other actions in furtherance of their conspiracy, as Defendants intended, directly, substantially, and foreseeably increased prices that purchasers paid for Conventional Eggs in the United States.

219. Plaintiff and members of the Classes have been injured and will continue to be injured in the form of overcharges on Conventional Eggs.

220. Plaintiff and members of the Nationwide Class are entitled to an injunction against Defendants, preventing and restraining the violations alleged herein.

## COUNT II

### Information Exchange in Violation of the Sherman Act, 15 U.S.C. §§ 1, 3
(On behalf of Nationwide Class for Injunctive and Equitable Relief)

221.    Plaintiff incorporates and realleges each allegation set forth in the preceding paragraphs, as though fully set forth herein.

222.    From at least January 1, 2022, and continuing through the present, the Defendants formed an unlawful contract, combination, or conspiracy in unreasonable restraint of trade in violation of Sections 1 and 3 of the Sherman Act, 15 U.S.C. §§ 1, 3.

223.    The contract, combination or conspiracy consisted of agreement to exchange competitively sensitive information about their operations, causing anticompetitive effects without sufficient procompetitive justifications.

224.    The information exchange has had the following effects, among others: (a) price competition in the market for Conventional Eggs has been restrained, suppressed, or eliminated; (b) prices for Conventional Eggs produced by Defendants and their co-conspirators have been fixed, raised, maintained, and stabilized at artificially high, non-competitive levels throughout the United States; (c) Plaintiff and members of the Class who purchased Conventional Eggs indirectly from Defendants and their co-conspirators have been deprived of the benefits of free and open competition; and (d) purchasers of Conventional Eggs paid artificially inflated prices.

225.    Plaintiff and members of the Class have been injured and will continue to be injured in the form of overcharges on Conventional Eggs.

226.    This information exchange has been undertaken in furtherance of a price fixing agreement, which is unlawful *per se*. Defendants' conduct is also unlawful under either a "quick look" or rule of reason analysis because the exchange is anticompetitive with no valid procompetitive justifications. Moreover, even if there were valid procompetitive justifications,

47

such justifications could have been reasonably achieved through means less restrictive of competition.

227.    Defendants' unlawful information exchange directly, substantially, and foreseeably increased prices that purchasers paid for Conventional Eggs in the United States.

228.    Plaintiff and members of the Class have been injured and will continue to be injured in the form of overcharges on Conventional Eggs.

229.    Plaintiff and members of the Nationwide Class are entitled to an injunction against Defendants, preventing and restraining the violations alleged herein.

## COUNT III

**Violations of State Antitrust Statutes – Price Fixing and Unlawful Information Exchange**
(On behalf of Plaintiff and the Commercial State Law Damages Class)

230.    Plaintiff incorporates and realleges each allegation set forth in the preceding paragraphs, as though fully set forth herein.

231.    During the Class Period, Defendants engaged in continuing contracts, combinations, or conspiracies with respect to the sale of Conventional Eggs in unreasonable restraint of trade and commerce and in violation of the various state antitrust and other statutes set forth below.

232.    One contract, combination, or conspiracy consisted of an agreement among Defendants to fix, raise, inflate, stabilize, or maintain at artificially supra-competitive prices for Conventional Eggs in the United States and its territories.

233.    A second contract, combination or conspiracy consisted of agreement to exchange competitively sensitive information about their operations, causing anticompetitive effects without sufficient procompetitive justifications.

48

234.    As a result, Plaintiff and members of the Damages Class were deprived of free and open competition and paid more for Conventional Eggs than they otherwise would have in the absence of Defendants' unlawful conduct. This injury is the type of harm the antitrust laws of the states included herein were designed to prevent, and this injury flows from that which makes Defendants' conduct unlawful.

235.    Accordingly, Plaintiff and the members of the Damages Class in each of the following jurisdictions seek damages (including statutory damages where applicable), to be trebled or otherwise increased as permitted by a particular jurisdiction's antitrust law, and costs of suit, including reasonable attorneys' fees, to the extent permitted by the following state laws.

236.    Defendants' anticompetitive acts described above were knowing, willful and constitute violations of the following state antitrust statutes:

237.    **Alabama**: Defendants have entered into unlawful agreements in restraint of trade in violation of Ala. Code § 6-5-60, *et seq*. Defendants' conspiracies had the following effects: (1) price competition for Conventional Eggs was restrained, suppressed, and eliminated  throughout Alabama; (2) Conventional Egg prices were raised,  fixed, maintained, and stabilized at artificially high levels throughout Alabama; (3) members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supra-competitive, artificially inflated prices for Conventional Eggs. During the Class Period, Defendants' illegal conduct substantially affected Alabama commerce. Accordingly, Plaintiff and members of the Damages Class seek all forms of relief available under Ala. Code § 6-5-60.

238.    **Arizona**: Defendants have entered into an unlawful agreements in restraint of trade in violation of Ariz. Rev. Stat. §§ 44-1401, *et seq.* Defendants' conspiracies had the following effects: (1) price competition for Conventional Eggs was restrained, suppressed, and eliminated

49

throughout Arizona; (2) Conventional Egg prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Arizona; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supra-competitive, artificially inflated prices for Conventional Eggs. During the Class Period, Defendants' illegal conduct substantially affected Arizona commerce. Accordingly, Plaintiff and members of the Damages Class seek all forms of relief available under Ariz. Rev. Stat. §§ 44-1401, *et seq*.

239. **California**: Defendants have entered into unlawful agreements in restraint of trade in violation of Cal. Bus. & Prof. Code §§ 16700, *et seq*. Defendants' conspiracies alleged herein has had the following effects: (1) price competition for Conventional Eggs has been restrained, suppressed, or eliminated in the State of California; (2) Conventional Egg prices were fixed, raised, stabilized, and pegged at artificially high, non-competitive levels throughout California; (3) members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supra-competitive, artificially inflated prices for Conventional Eggs. During the Class Period, Defendants' illegal conduct substantially affected California commerce. Accordingly, Plaintiff and members of the Damages Class seek all forms of relief available under Cal. Bus. & Prof. Code §§ 16720 *et seq*.

240. **Colorado**: Defendants have entered into an unlawful agreement in restraint of trade in violation of Colo. Rev. Stat. §§ 6-4-104, *et seq*. Defendants' conspiracies had the following effects: (1) price competition for Conventional Eggs was restrained, suppressed, and eliminated throughout Colorado; (2) Conventional Egg prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Colorado; (3) members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supra-competitive,

50

artificially inflated prices for Conventional Eggs. During the Class Period, Defendants' illegal conduct substantially affected Colorado commerce. Accordingly, Plaintiff and members of the Damages Class seek all forms of relief available under Colo. Rev. Stat. §§ 6-4-104, *et seq.*

241.    **Connecticut**: Defendants have entered into unlawful agreements in restraint of trade in violation of Conn. Gen. Stat. Ann. §§ 35-26, *et seq.* Defendants' conspiracies had the following effects: (1) price competition for Conventional Eggs was restrained, suppressed, and eliminated throughout Connecticut; (2) Conventional Egg prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Connecticut; (3) members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supra-competitive, artificially inflated prices for Conventional Eggs. During the Class Period, Defendants' illegal conduct substantially affected Connecticut commerce. Accordingly, Plaintiff and members of the Damages Class seek all forms of relief available under Conn. Gen. Stat. Ann. §§ 35-26, *et seq.*

242.    **District of Columbia**: Defendants have entered into unlawful agreements in restraint of trade in violation of D.C. Code §§ 28-4501, *et seq.* Defendants' conspiracies had the following effects: (1) price competition for Conventional Eggs was restrained, suppressed, and eliminated throughout the District of Columbia; (2) Conventional Egg prices were raised, fixed, maintained, and stabilized at artificially high levels throughout the District of Columbia; (3) members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supra-competitive, artificially inflated prices for Conventional Eggs. During the Class Period, Defendants' illegal conduct substantially affected commerce in the District of Columbia. Accordingly, Plaintiff and members of the Damages Class seek all forms of relief available under D.C. Code §§ 28-4501, *et seq.*

51

243.    **Hawaii:** Defendants have entered into unlawful agreements in restraint of trade in violation of Haw. Rev. Stat. §§ 480-1, *et seq*. Defendants' conspiracies had the following effects: (1) price competition for Conventional Eggs was restrained, suppressed, and eliminated throughout Hawaii; (2) Conventional Egg prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Hawaii; (3) members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supra-competitive, artificially inflated prices for Conventional Eggs. During the Class Period, Defendants' illegal conduct substantially affected Hawaii commerce. Accordingly, Plaintiff and members of the Damages Class seek all forms of relief available under Haw. Code §§ 480-1, *et seq*.

244.    **Illinois**: Defendants have entered into unlawful agreements in restraint of trade in violation of the Illinois Antitrust Act, 740 Illinois Compiled Statutes 10/1, *et seq*. Defendants' conspiracies had the following effects: (1) price competition for Conventional Eggs was restrained, suppressed, and eliminated throughout Illinois; (2) Conventional Egg prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Illinois; (3) members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supra-competitive, artificially inflated prices for Conventional Eggs. During the Class Period, Defendants' illegal conduct substantially affected Illinois commerce. Accordingly, Plaintiff and members of the Damages Class seek all forms of relief available under 740 Illinois Compiled Statutes 10/1, *et seq*.

245.    **Iowa**: Defendants have entered into unlawful agreements in restraint of trade in violation of Iowa Code §§ 553.1, *et seq*. Defendants' conspiracies had the following effects: (1) price competition for Conventional Eggs was restrained, suppressed, and eliminated throughout Iowa; (2) Conventional Egg prices were raised, fixed, maintained and stabilized at artificially high

levels throughout Iowa; (3) members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supra-competitive, artificially inflated prices for Conventional Eggs. During the Class Period, Defendants' illegal conduct substantially affected Iowa commerce. Accordingly, Plaintiff and members of the Damages Class seek all forms of relief available under Iowa Code §§ 553.1, *et seq*.

246.    **Kansas**: Defendants have entered into unlawful agreements in restraint of trade in violation of Kan. Stat. §§ 50-101, *et seq*. Defendants' conspiracies had the following effects: (1) price competition for Conventional Eggs was restrained, suppressed, and eliminated throughout Kansas; (2) Conventional Egg prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Kansas; (3) members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supra-competitive, artificially inflated prices for Conventional Eggs. During the Class Period, Defendants' illegal conduct substantially affected Kansas commerce. Accordingly, Plaintiff and members of the Damages Class seek all forms of relief available under Kan. Stat. §§ 50-101, *et seq*.

247.    **Maine**: Defendants have entered into unlawful agreements in restraint of trade in violation of Me. Rev. Stat. Ann. tit. 10, §§ 1101 *et seq*. Defendants' conspiracies had the following effects: (1) price competition for Conventional Eggs was restrained, suppressed, and eliminated throughout Maine; (2) Conventional Egg prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Maine; (3) members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supra-competitive, artificially inflated prices for Conventional Eggs. During the Class Period, Defendants' illegal conduct substantially affected Maine commerce. Accordingly, Plaintiff and members of the Damages Class seek all relief available under Me. Rev. Stat. Ann. tit. 10, §§ 1104.

248. **Maryland**. Defendants have entered into unlawful agreements in restraint of trade in violation of Md. Commercial Law Code Ann. § 11-201, et seq. Defendants' conspiracies had the following effects: (1) price competition for Conventional Eggs was restrained, suppressed, and eliminated throughout Maine; (2) Conventional Egg prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Maine; (3) members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supra-competitive, artificially inflated prices for Conventional Eggs. During the Class Period, Defendants' illegal conduct substantially affected Maine commerce. Accordingly, Plaintiff and members of the Damages Class seek all relief available under Me. Rev. Stat. Ann. tit. 10, §§ 1104.

249. **Michigan**: Defendants have entered into unlawful agreements in restraint of trade in violation of Mich. Comp. Laws §§ 445.771, *et seq*. Defendants' conspiracies had the following effects: (1) price competition for Conventional Eggs was restrained, suppressed, and eliminated throughout Michigan; (2) Conventional Egg prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Michigan; (3) members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supra-competitive, artificially inflated prices for Conventional Eggs. During the Class Period, Defendants' illegal conduct substantially affected Michigan commerce. Accordingly, Plaintiff and members of the Damages Class seek all relief available under Mich. Comp. Laws §§ 445.771, *et seq*.

250. **Minnesota**: Defendants have entered into unlawful agreements in restraint of trade in violation of Minn. Stat. §§ 325D.49, *et seq*. Defendants' conspiracies had the following effects: (1) Price competition for Conventional Eggs was restrained, suppressed, and eliminated throughout Minnesota; (2) Conventional Egg prices were raised, fixed, maintained, and stabilized

54

at artificially high levels throughout Minnesota; (3) members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supra-competitive, artificially inflated prices for Conventional Eggs. During the Class Period, Defendants' illegal conduct substantially affected Minnesota commerce. Accordingly, Plaintiff and members of the Damages Class seek all relief available under Minn. Stat. §§ 325D.49, *et seq*.

251.    **Mississippi**: Defendants have entered into unlawful agreements in restraint of trade in violation of Miss. Code §§ 75-21-1, *et seq*. Defendants' conspiracies had the following effects: (1) price competition for Conventional Eggs was restrained, suppressed, and eliminated throughout Mississippi; (2) Conventional Egg prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Mississippi; (3) members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supra-competitive, artificially inflated prices for Conventional Eggs. During the Class Period, Defendants' illegal conduct substantially affected Mississippi commerce. Accordingly, Plaintiff and members of the Damages Class seek all relief available under Miss. Code §§ 75-21-1, *et seq*.

252.    **Nebraska**: Defendants have entered into unlawful agreements in restraint of trade in violation of Neb. Rev. Stat. §§ 59-801, *et seq*. Defendants' conspiracies had the following effects: (1) price competition for Conventional Eggs was restrained, suppressed, and eliminated throughout Nebraska; (2) Conventional Egg prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Nebraska; (3) members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supra-competitive, artificially inflated prices for Conventional Eggs. During the Class Period, Defendants' illegal conduct substantially affected Nebraska commerce. Accordingly, Plaintiff and members of the Damages Class seek all relief available under Neb. Rev. Stat. §§ 59-801, *et seq*.

253.    **Nevada**: Defendants have entered into unlawful agreements in restraint of trade in violation of Nev. Rev. Stat. Ann. §§ 598A.010, *et seq*. Defendants' conspiracies had the following effects: (1) price competition for Conventional Eggs was restrained, suppressed, and eliminated throughout Nevada; (2) Conventional Egg prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Nevada; (3) members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supra-competitive, artificially inflated prices for Conventional Eggs. During the Class Period, Defendants' illegal conduct substantially affected Nevada commerce. Accordingly, Plaintiff and members of the Damages Class seek all relief available under Nev. Rev. Stat. Ann. §§ 598A.010, *et seq*.

254.    **New Hampshire**: Defendants have entered into unlawful agreements in restraint of trade in violation of New Hampshire Revised Statutes Ann. § 356:1. Defendants' conspiracies had the following effects: (1) price competition for Conventional Eggs was restrained, suppressed, and eliminated throughout New Hampshire; (2) Conventional Egg prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New Hampshire; (3) members of the Damages Class were deprived of free and open competition; and(4) members of the Damages Class paid supra-competitive, artificially inflated prices for Conventional Eggs. During the Class Period, Defendants' illegal conduct substantially affected New Hampshire commerce. Accordingly, Plaintiff and members of the Damages Class seek all relief available under New Hampshire Revised Statutes § 356:1, *et seq*.

255.    **New Jersey**. Defendants have entered into unlawful agreements in restraint of trade in violation of New Jersey Annotated Statutes § 56:9-1, *et seq*. Defendants' conspiracies had the following effects: (1) price competition for Conventional Eggs was restrained, suppressed, and eliminated throughout New Jersey; (2) Conventional Egg prices were raised, fixed, maintained,

and stabilized at artificially high levels throughout New Jersey; (3) members of the Damages Class were deprived of free and open competition; and(4) members of the Damages Class paid supra-competitive, artificially inflated prices for Conventional Eggs. During the Class Period, Defendants' illegal conduct substantially affected New Jersey commerce. Accordingly, Plaintiff and members of the Damages Class seek all relief available under New Jersey Annotated Statutes § 56:9-1, *et seq.*

256.    **New Mexico**: Defendants have entered into unlawful agreements in restraint of trade in violation of New Mexico Statutes Annotated §§ 57-1-1, *et seq*. Defendants' conspiracies had the following effects: (1) price competition for Conventional Eggs was restrained, suppressed, and eliminated throughout New Mexico; (2) Conventional Egg prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New Mexico; (3) members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supra-competitive, artificially inflated prices for Conventional Eggs. During the Class Period, Defendants' illegal conduct substantially affected New Mexico commerce. Accordingly, Plaintiff and members of the Damages Class seek all relief available under New Mexico Statutes Annotated §§ 57-1-1, *et seq*.

257.    **New York**: Defendants have entered into unlawful agreements in restraint of trade in violation of New York General Business Laws §§ 340, *et seq*. Defendants' conspiracies had the following effects: (1) price competition for Conventional Eggs was restrained, suppressed, and eliminated throughout New York; (2) Conventional Egg prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New York; (3) members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supra-competitive, artificially inflated prices for Conventional Eggs. During the Class Period,

57

Defendants' illegal conduct substantially affected New York commerce. Accordingly, Plaintiff and members of the Damages Class seek all relief available under New York General Business Laws §§ 340, *et seq*.

258.    **North Carolina**: Defendants have entered into unlawful agreements in restraint of trade in violation of North Carolina General Statutes §§ 75-1, *et seq*. Defendants' conspiracies had the following effects: (1) price competition for Conventional Eggs was restrained, suppressed, and eliminated throughout North Carolina; (2) Conventional Egg prices were raised, fixed, maintained, and stabilized at artificially high levels throughout North Carolina; (3) members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supra-competitive, artificially inflated prices for Conventional Eggs. During the Class Period, Defendants' illegal conduct substantially affected North Carolina commerce. Accordingly, Plaintiff and members of the Damages Class seek all relief available under North Carolina General Statutes §§ 75-1, *et seq*.

259.    **North Dakota**: Defendants have entered into unlawful agreements in restraint of trade in violation of N.D. Cent. Code §§ 51-08.1-01, *et seq*. Defendants' conspiracies had the following effects: (1) price competition for Conventional Eggs was restrained, suppressed, and eliminated throughout North Dakota; (2) Conventional Egg prices were raised, fixed, maintained, and stabilized at artificially high levels throughout North Dakota; (3) members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supra-competitive, artificially inflated prices for Conventional Eggs. During the Class Period, Defendants' illegal conduct had a substantial effect on North Dakota commerce. Accordingly, Plaintiff and members of the Damages Class seek all relief available under N.D. Cent. Code §§ 51-08.1-01, *et seq*.

260.    **Oregon**: Defendants have entered into unlawful agreements in restraint of trade in violation of Or. Rev. Stat. §§ 646.725, *et seq*. Defendants' conspiracies had the following effects: (1) price competition for Conventional Eggs was restrained, suppressed, and eliminated throughout Oregon; (2) Conventional Egg prices were raised, fixed, maintained and stabilized at artificially high levels throughout Oregon; (3) members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supra-competitive, artificially inflated prices for Conventional Eggs. During the Class Period, Defendants' illegal conduct had a substantial effect on Oregon commerce. Accordingly, Plaintiff and members of the Damages Class seek all relief available under Or. Rev. Stat. §§ 646.780, *et seq*.

261.    **Rhode Island**: Defendants have entered into unlawful agreements in restraint of trade in violation of Rhode Island General Laws §§ 6-36-4, *et seq*. Defendants' conspiracies had the following effects: (1) price competition for Conventional Eggs was restrained, suppressed, and eliminated throughout Rhode Island; (2) Conventional Egg prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Rhode Island; (3) members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supra-competitive, artificially inflated prices for Conventional Eggs. During the Class Period, Defendants' illegal conduct had a substantial effect on Rhode Island commerce. Accordingly, Plaintiff and members of the Damages Class seek all relief available under Rhode Island General Laws §§ 6-36-11, *et seq*.

262.    **South Dakota**: Defendants have entered into unlawful agreements in restraint of trade in violation of South Dakota Codified Laws §§ 37-1-3.1, *et seq*. Defendants' conspiracies had the following effects: (1) price competition for Conventional Eggs was restrained, suppressed, and eliminated throughout South Dakota; (2) Conventional Egg prices were raised, fixed, maintained,

59

and stabilized at artificially high levels throughout South Dakota; (3) members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supra-competitive, artificially inflated prices for Conventional Eggs. During the Class Period, Defendants' illegal conduct had a substantial effect on South Dakota commerce. Accordingly, Plaintiff and members of the Damages Class seek all relief available under South Dakota Codified Laws §§ 37-1-3.1, *et seq*.

263.    **Tennessee**: Defendants have entered into unlawful agreements in restraint of trade in violation of Tenn. Code Ann. §§ 47-25-101, et seq. Defendants' conspiracies had the following effects: (1) price competition for Conventional Eggs was restrained, suppressed, and eliminated throughout Tennessee; (2) Conventional Egg prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Tennessee; (3) members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supra-competitive, artificially inflated prices for Conventional Eggs. During the Class Period, Defendants' illegal conduct had a substantial effect on Tennessee commerce. Accordingly, Plaintiff and members of the Damages Class seek all relief available under Tenn. Code Ann. §§ 47-25-101, *et seq*.

264.    **Utah**: Defendants have entered into unlawful agreements in restraint of trade in violation of Utah Code Annotated §§ 76-10-3101, *et seq*. Defendants' conspiracies had the following effects: (1) price competition for Conventional Eggs was restrained, suppressed, and eliminated throughout Utah; (2) Conventional Egg prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Utah; (3) members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supra-competitive, artificially inflated prices for Conventional Eggs. During the Class  Period, Defendants' illegal conduct had a substantial effect on Utah commerce. Accordingly,

60

Plaintiff and members of the Damages Class seek all relief available under Utah Code Annotated §§ 76-10-3101, *et seq*.

265.    **Vermont**: Defendants have entered into an unlawful agreements in restraint of trade in violation of 9 Vermont Stat. Ann. §§ 2453, *et seq*. Defendants' conspiracies had the following effects: (1) price competition for Conventional Eggs was restrained, suppressed, and eliminated throughout Vermont; (2) Conventional Egg prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Vermont; (3) members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supra-competitive, artificially inflated prices for Conventional Eggs. During the Class Period, Defendants' illegal conduct had a substantial effect on Vermont commerce. Accordingly, Plaintiff and members of the Damages Class seek all relief available under 9 Vermont Stat. Ann. §§ 2465, *et seq*.

266.    **West Virginia**: Defendants have entered into unlawful agreements in restraint of trade in violation of West Virginia Code §§ 47-18-3, *et seq*. Defendants' conspiracies had the following effects: (1) price competition for Conventional Eggs was restrained, suppressed, and eliminated throughout West Virginia; (2) Conventional Egg prices were raised, fixed, maintained, and stabilized at artificially high levels throughout West Virginia; (3) members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supra-competitive, artificially inflated prices for Conventional Eggs. During the Class Period, Defendants' illegal conduct had a substantial effect on West Virginia commerce. Accordingly, Plaintiff and members of the Damages Class seek all relief available under West Virginia Code §§ 47-18-9, *et seq*.

267.    **Wisconsin**: Defendants have entered into unlawful agreements in restraint of trade in violation of Wis. Stat. §§ 133.01, *et seq*. Defendants' conspiracies had the following effects: (1)

61

price competition for Conventional Eggs was restrained, suppressed, and eliminated throughout Wisconsin; (2) Conventional Egg prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Wisconsin; (3) members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supra-competitive, artificially inflated prices for Conventional Eggs. During the Class Period, Defendants' illegal conduct had a substantial effect on Wisconsin commerce. Accordingly, Plaintiff and members of the Damages Class seek all relief available under Wis. Stat. §§ 133.01, *et seq*.

## COUNT IV

### Violation of State Consumer Protection Statutes – Price Fixing and Unlawful Information Exchange
(On behalf of Plaintiff and the Commercial State Law Damages Class)

268.    Plaintiff incorporates and realleges, each allegation set forth in the preceding paragraphs, as though fully set forth herein.

269.    During the Class Period, Defendants engaged in unfair competition or unfair, or unconscionable acts or practices in violation of the state consumer protection and unfair competition statutes listed below.

270.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and Class members were injured and are threatened with further injury.

271.    Defendants' anticompetitive acts, described herein, constitute violations of the following state consumer protection laws:

272.    **California**: Defendants have engaged in unfair competition, unfair and unlawful acts or practices in violation of Cal. Bus. & Prof. Code §§ 17200, *et seq*. Defendants' unfair and unlawful conduct has had the following effects: (1) price competition for Conventional Eggs was restrained, suppressed, and eliminated throughout California; (2) Conventional Egg prices were raised, fixed, maintained, and stabilized at artificially high levels throughout California; (3)

62

members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supra-competitive, artificially inflated prices for Conventional Eggs. During the Class Period, Defendants' unlawful and unfair conduct substantially impacted commerce in California. Accordingly, Plaintiff and Class members seek all forms of available relief under this statute.

273.    **Florida**: Defendants have engaged in unfair trade, unfair, or unconscionable acts or practices in violation of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.201, *et seq*. Defendants' conduct has had the following effects: (1) price competition for Conventional Eggs was restrained, suppressed, and eliminated throughout Florida; (2) Conventional Egg prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Florida; (3) members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supra-competitive, artificially inflated prices for Conventional Eggs. During the Class Period, Defendants' unlawful and unconscionable conduct substantially impacted commerce in Florida. Accordingly, Plaintiff and Class members seek all forms of available relief under Fla. Stat. §§ 501.201, *et seq*.

274.    **Hawaii**: Defendants have engaged in unfair competition, unfair or unconscionable acts or practices in violation in violation of Haw. Rev. Stat. § 480-2. Defendants' conduct has had the following effects: (1) price competition for Conventional Eggs was restrained, suppressed, and eliminated throughout Hawaii; (2) Conventional Egg prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Hawaii; (3) members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supra-competitive, artificially inflated prices for Conventional Eggs. During the Class Period, Defendants' unfair and unconscionable conduct substantially impacted commerce in Hawaii.

63

Accordingly, Plaintiff and Class members seek all forms of available relief under Haw. Rev. Stat. § 480-2.

275. **Illinois**: Defendants have engaged in unfair competition, unfair or unconscionable acts or practices in violation of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 Ill. Comp. Stat. Ann. 505/10a, *et seq*. Defendants' conduct has had the following effects: (1) price competition for Conventional Eggs was restrained, suppressed, and eliminated throughout Illinois; (2) Conventional Egg prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Illinois; (3) members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supra-competitive, artificially inflated prices for Conventional Eggs. During the Class Period, Defendants' unfair and unconscionable conduct substantially impacted commerce in Illinois. Accordingly, Plaintiff and Class members seek all forms of available relief under 815 Ill. Comp. Stat. Ann. 505/10a, *et seq*.

276. **Massachusetts**: Defendants have engaged in unfair competition, unfair or unconscionable acts or practices in violation of the Massachusetts Consumer Protection Act, Mass. Gen. Laws Ann. Ch. 93A, §1, *et seq*. Defendants' conduct has had the following effects: (1) price competition for Conventional Eggs was restrained, suppressed, and eliminated throughout Massachusetts; (2) Conventional Egg prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Massachusetts; (3) members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supra-competitive, artificially inflated prices for Conventional Eggs. During the Class Period, Defendants' unfair and unconscionable conduct substantially impacted commerce in Massachusetts. Accordingly, Plaintiff and Class members seek all forms of available relief under Mass. Gen. Laws Ann. Ch. 93A, §1, et seq.

277.    **Minnesota**: Defendants have engaged in unfair competition, unfair or unconscionable acts or practices in violation of the Minnesota Consumer Protection Act, Minn. Stat. § 325F.69, *et seq*. Defendants' conduct has had the following effects: (1) price competition for Conventional Eggs was restrained, suppressed, and eliminated throughout Minnesota; (2) Conventional Egg prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Minnesota; (3) members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supra-competitive, artificially inflated prices for Conventional Eggs. During the Class Period, Defendants' unfair and unconscionable conduct substantially impacted commerce in Minnesota. Accordingly, Plaintiff and Class members seek all forms of available relief under Minn. Stat. § 325F.69, *et seq*.

278.    **Nebraska**: Defendants have engaged in unfair competition, unfair or unconscionable acts or practices in violation of the Nebraska Consumer Protection Act, Neb. Rev. Stat. § 59-1601, *et seq*. Defendants' conduct has had the following effects: (1) price competition for Conventional Eggs was restrained, suppressed, and eliminated throughout Nebraska; (2) Conventional Egg prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Nebraska; (3) members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supra-competitive, artificially inflated prices for Conventional Eggs. During the Class Period, Defendants' unfair and unconscionable conduct substantially impacted commerce in Nebraska. Accordingly, Plaintiff and Class members seek all forms of available relief under Neb. Rev. Stat. § 59-1601, *et seq*.

279.    **Nevada**: Defendants have engaged in unfair competition, unfair, or unconscionable acts or practices in violation of the Nevada Deceptive Trade Practices Act. Nev. Stat. § 598.0923, *et seq*. Defendants' conduct has had the following effects: (1) price competition for Conventional

65

Eggs was restrained, suppressed, and eliminated throughout Nevada; (2) Conventional Egg prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Nevada; (3) members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supra-competitive, artificially inflated prices for Conventional Eggs. During the Class Period, Defendants' unlawful, unfair, or unconscionable conduct substantially impacted commerce in Nevada. Accordingly, Plaintiff and Class members seek all forms of available relief under Nev. Stat. § 598.0923, *et seq*.

280.    **New Jersey:** Defendants have engaged in unfair competition, unfair, or unconscionable acts or practices in violation of the New Jersey Consumer Fraud Act, N.J. Stat. Ann. 56:8-1 *et seq.*, Defendants' conduct has had the following effects: (1) price competition for Conventional Eggs was restrained, suppressed, and eliminated throughout New Jersey; (2) Conventional Egg prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New Jersey; (3) members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supra-competitive, artificially inflated prices for Conventional Eggs. During the Class Period, Defendants' unlawful, unfair, or unconscionable conduct substantially impacted commerce in New Jersey. Accordingly, Plaintiff and Class members seek all forms of available relief under N.J. Stat. Ann. 56:8-1 *et seq*.

281.    **New Mexico**: Defendants have engaged in unfair competition, unfair unconscionable acts or practices in violation of New Mexico Stat. §§ 57-12-1, *et seq*. Defendants' conduct has had the following effects: (1) price competition for Conventional Eggs was restrained, suppressed, and eliminated throughout New Mexico; (2) Conventional Egg prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New Mexico; (3) members of the Damages Class were deprived of free and open competition; and (4) members of the

66

Damages Class paid supra-competitive, artificially inflated prices for Conventional Eggs. During the Class Period, Defendants' unlawful, unfair, and unconscionable conduct substantially impacted commerce in New Mexico. Accordingly, Plaintiff and Class members seek all forms of available relief under N.M. Stat. §§ 57-12-1, *et seq*.

282.    **North Carolina**: Defendants have engaged in unfair competition, unfair, or unconscionable in violation of N.C. Gen. Stat. §§ 75-1.1, *et seq*. Defendants' conduct has had the following effects: (1) price competition for Conventional Eggs was restrained, suppressed, and eliminated throughout North Carolina; (2) Conventional Egg prices were raised, fixed, maintained, and stabilized at artificially high levels throughout North Carolina; (3) members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supra-competitive, artificially inflated prices for Conventional Eggs. During the Class Period, Defendants' unlawful, unfair, or unconscionable conduct substantially impacted commerce in North Carolina. Accordingly, Plaintiff and Class members seek all forms of available relief under this statute. N.C. Gen. Stat. §§ 75-1.1, et *seq*.

283.    **Rhode Island**: Defendants have engaged in unfair competition, unfair, or unconscionable acts or practices in violation of the Rhode Island Unfair Trade Practice and Consumer Protection Act. R.I. Gen. Laws §§ 6-13.1-1, *et seq*. Defendants' conduct has had the following effects: (1) price competition for Conventional Eggs was restrained, suppressed, and eliminated throughout Rhode Island; (2) Conventional Egg prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Rhode Island; (3) members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supra-competitive, artificially inflated prices for Conventional Eggs. During the Class Period, Defendants' unlawful, unfair, or unconscionable conduct substantially impacted commerce in

67

Rhode Island. Accordingly, Plaintiff and Class members seek all forms of available relief under R.I. Gen. Laws §§ 6-13.1-1, *et seq*.

284. **Vermont**: Defendants have engaged in unfair competition, unfair, or unconscionable acts or practices in violation of 9 Vermont Stat. Ann. §§ 2451, *et seq*. Defendants' conduct has had the following effects: (1) price competition for Conventional Eggs was restrained, suppressed, and eliminated throughout Vermont; (2) Conventional Egg prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Vermont; (3) members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supra-competitive, artificially inflated prices for Conventional Eggs. During the Class Period, Defendants' unlawful, unfair, or unconscionable conduct substantially impacted commerce in Vermont. Accordingly, Plaintiff and Class members seek all forms of available relief under 9 Vermont Stat. Ann. §§ 2451, *et seq*.

285. **West Virginia**: Defendants have engaged in unfair competition, unfair, or unconscionable acts or practices in violation of the West Virginia Consumer Credit and Protection Act, W.Va. Code §§ 46A-6-101, *et seq*. Defendants' conduct has had the following effects: (1) price competition for Conventional Eggs was restrained, suppressed, and eliminated throughout West Virginia; (2) Conventional Egg prices were raised, fixed, maintained, and stabilized at artificially high levels throughout West Virginia; (3) members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supra-competitive, artificially inflated prices for Conventional Eggs. During the Class Period, Defendants' unlawful, unfair, or unconscionable conduct substantially impacted commerce in West Virginia. Accordingly, Plaintiff and Class members seek all forms of available relief under W.Va. Code §§ 46A-6-101, *et seq*.

## COUNT V

### Unjust Enrichment
(On Behalf of Plaintiff and the Commercial State Law Damages Class)

286. Plaintiff incorporates and realleges, as though fully set forth herein, each allegation set forth in the preceding paragraphs.

287. To the extent required, this claim is pleaded in the alternative to the other claims in this Complaint.[18]

288. As a result of their unlawful conduct described above, Defendants have and will continue to be unjustly enriched. Defendants have been unjustly enriched by the receipt of, at a minimum, unlawfully inflated prices, and unlawful profits on sales of Conventional Eggs.

289. Defendants have benefitted from their unlawful acts, and it would be inequitable for Defendants to be permitted to retain any of the ill-gotten gains resulting from the overpayments made by Plaintiff or the Class Members for Conventional Eggs.

290. Plaintiff and Class Members are entitled to the amount of Defendants' ill-gotten gains resulting from their unlawful, unjust, and inequitable conduct. Plaintiff and Class Members are entitled to the establishment of a constructive trust consisting of all ill-gotten gains from which Plaintiff and the members of the Class may make claims on a pro rata basis.

291. Pursuit of any remedies against the firms from whom Plaintiff and Class Members purchased eggs subject to Defendants' conspiracy would have been futile, given that those firms did not take part in Defendants' conspiracy.

---

[18] Unjust enrichment claims are alleged under the laws of the following states: Alabama, Arkansas, Arizona, California, Connecticut, District of Columbia, Florida, Hawaii, Illinois, Iowa, Kansas, Maine, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Carolina, South Dakota, Tennessee, Utah, Vermont, West Virginia, and Wisconsin.

## X.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that the Court enter judgment on its behalf and on behalf of the Classes herein, adjudging and decreeing that:

A.    The unlawful conduct, conspiracy or combination alleged herein be adjudged and decreed: (a) an unreasonable restraint of trade or commerce in violation of Section 1 of the Sherman Act; (b) a *per se* violation of Section 1 of the Sherman Act; (c) an unlawful combination, trust, agreement, understanding or concert of action in violation of the state antitrust and unfair competition and consumer protection laws as set forth herein; or, alternatively, (d) acts of unjust enrichment by Defendants as set forth herein;

B.    Plaintiff and the Damages Class recover damages, to the maximum extent allowed under the applicable state laws, and that a joint and several judgment in favor of Plaintiff and members of the Damages Class be entered against Defendants in an amount to be trebled to the extent such laws permit;

C.    Plaintiff and members of the Damages Class recover damages, to the maximum extent allowed by such laws, in the form of restitution or disgorgement of profits unlawfully obtained;

D.    Plaintiff and members of the Damages Class be awarded restitution, including disgorgement of profits Defendants obtained as a result of their acts of unfair competition and acts of unjust enrichment, and the Court establish of a constructive trust consisting of all ill-gotten gains from which Plaintiff and members of the Damages Class may make claims on a pro rata basis;

E.    Defendants, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining or renewing the conduct, conspiracy, or combination alleged herein, or from entering into any other conspiracy or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

F.    Defendants, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents, and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining, or renewing the sharing of highly sensitive competitive information that permits individual identification of company's information;

70

G.     Plaintiff and the members of the Damages Class be awarded pre- and post-judgment interest as provided by law, and that such interest be awarded at the highest legal rate from and after the date of service of this Complaint;

H.     Plaintiff and the members of the Classes recover their costs of suit, including reasonable attorneys' fees, as provided by law; and

I.     Any other relief as the case may require and the Court may deem just and proper.

## XI.     DEMAND FOR TRIAL BY JURY

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff hereby demands a trial by jury on all issues so triable.

Dated: May 4, 2026

**LITE DEPALMA GREENBERG & AFANADOR, LLC**

*/s/ Laura K. Mummert*
Laura K. Mummert
Steven J. Greenfogel*
**LITE DEPALMA GREENBERG & AFANADOR, LLC**
1515 Market Street, Suite 1200
Philadelphia, PA 19102
(267) 314-7980
lmummert@litedepalma.com
sgreenfogel@litedepalma.com

Joseph J. DePalma*
**LITE DEPALMA GREENBERG & AFANADOR, LLC**
570 Broad Street, Suite 1201
Newark, NJ 07102
(973) 623-3000
jdepalma@litedepalma.com

*Attorneys for Plaintiff and the Putative Class*

**Pro Hac Vice Forthcoming*

71